# STATE OF MICHIGAN

# COURT OF APPEALS

CATHERINE PUETZ, MD,

        Plaintiff-Appellant,

v

SPECTRUM HEALTH HOSPITALS and KEVIN
SPLAINE,

        Defendant-Appellees.

FOR PUBLICATION
April 24, 2018
9:15 a.m.

No. 335329
Kent Circuit Court
LC No. 15-006618-CB

Before: MARKEY, P.J., and M. J. KELLY and CAMERON, JJ.

M. J. KELLY, J.

Plaintiff, Catherine Puetz, M.D., appeals by right the trial court order dismissing her complaint under MCR 2.116(C)(7) (statute of limitations) and MCR 2.116(C)(10) (no genuine issue of material fact). For the reasons stated in this opinion, we affirm in part and reverse in part.

## I. BASIC FACTS

In 1999, Puetz took a job with Emergency Care Specialists (ECS), a physicians' group representing about 150 physicians and about 70 physician's assistants. ECS exclusively staffs its physicians at hospitals run by defendant, Spectrum Health Hospitals (Spectrum). Through her relationship with ECS, Puetz had admission privileges in emergency services and observation medicine at Spectrum. In addition, Puetz was appointed to serve as the associate medical director of observation medicine, the associate medical director for ED cardiovascular medicine, and the clinical advisor for pediatrics at Spectrum. In connection with her role at Spectrum, Puetz developed certain observation protocols, which she admitted were created for Spectrum's use and placed on Spectrum's intranet.

Because the observation program at Spectrum was considered a success, individuals and organizations outside of Spectrum and ECS were interested in it. As a result, in the summer of 2013, ECS and Puetz decided to prepare a pamphlet on observation medicine in an effort to start consulting on the subject. When Spectrum learned about the pamphlet, it instructed ECS that it had to work with Spectrum on any consulting or observation work. Further, a meeting was held on the pamphlet/consulting work in July 2013. At the meeting, Spectrum claimed ownership of the observation materials. A follow-up meeting was scheduled, but did not occur before Puetz

was, essentially, prohibited from working at Spectrum in any capacity because of her comments on a Facebook page.

The record reflects that on August 5, 2013, a Spectrum nurse posted on a public Facebook page a photograph of the backside of an overweight woman and the caption: "Don't judge me. I like what I like." In response to the post, 12 Spectrum employees and 3 ECS employees commented on the photograph on Facebook. Relevant to this appeal, Puetz was the sixth person to comment, and she stated "OMG is that [patient's initials]? You are soo naughty."

A Spectrum staff member saw the post on Facebook, was uncomfortable with the dialogue, and reported it to Spectrum. Kevin Splaine, Spectrum's president, testified that the decision was made to discipline those involved. Initially, Spectrum decided to remove Puetz from her administrative roles at the hospital. However, Splaine testified that as the investigation into the incident continued, he decided that additional discipline was warranted. According to Splaine, "anyone with whom we could prove was part of this dialogue knew that this was a patient, if they were an employee of Spectrum Health, they would be terminated. If they were contracting with Spectrum Health, the contract would be terminated. And if they were privileged at Spectrum Health, we would not allow them to practice at Spectrum Health Hospitals." The other individuals involved received a written reprimand. By August 19, 2013, Puetz was informed that she was being removed from both her "administrative leadership position and clinical" because of the Facebook incident.

On August 21, 2013, after making that decision, Splaine spoke at an ECS meeting. Ostensibly, Splaine spoke at the meeting because there was "a lot of angst and concern" about the decision to remove Puetz, and ECS wanted to hear Spectrum's side of it. Splaine apparently did not refer to Puetz by name at the meeting; however, he allegedly told everyone at the meeting that Puetz's comments on Facebook violated HIPAA.[1] In addition, Splaine sent ECS a letter demanding that Puetz and another employee of ECS not be scheduled at any hospital owned by Spectrum. In the letter, Splaine referred to Puetz and the other employee's conduct as reprehensible, unprofessional, and disturbing.

On March 14, 2014, Puetz filed a complaint in the United Stated District Court for the Western District of Michigan, alleging defamation, false light invasion of privacy, breach of contract, intellectual property ownership, and two counts of tortious interference with a business expectancy. Only count IV, the intellectual property ownership claim, arguably fell within the federal court's original jurisdiction. After discovery closed, the federal district court sua sponte issued a show-cause order regarding subject-matter jurisdiction. Thereafter, the court determined that it lacked subject-matter jurisdiction over the intellectual property claim and dismissed the entire complaint without prejudice.

Within 30 days of her federal complaint being dismissed, Puetz filed a claim in the Kent County Circuit Court. In response, Spectrum moved for summary disposition under MCR 2.116(C)(7) with regard to the defamation claim and for summary disposition under MCR

---

[1] Health Insurance Portability and Accountability Act (HIPAA), 42 USC 1320d *et seq*.

2.116(C)(10) for the remaining claims. Puetz also moved for partial summary disposition on the defamation claim, asserting that Splaine's comments were defamation per se, and she asked the court to rule as a matter of law that her comments on Facebook did not constitute a violation of HIPAA. After oral argument, the trial court entered a written opinion and order dismissing the defamation claim under MCR 2.116(C)(7) and dismissing the remaining claims under MCR 2.116(C)(10).

## II. DISMISSAL UNDER MCR 2.116(C)(7)

### A. STANDARD OF REVIEW

Puetz first argues that the trial court erred by dismissing her defamation claim under MCR 2.116(C)(7). Whether a trial court properly granted summary disposition on statute of limitations grounds is reviewed de novo. *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009). "Summary disposition under MCR 2.116(C)(7) is appropriate when the undisputed facts establish that the plaintiff's claim is barred under the applicable statute of limitations." *Kincaid v Cardwell*, 300 Mich App 513, 522; 834 NW2d 122 (2013). In addition, issues regarding the proper interpretation and application of statutes are reviewed de novo. *Petersen v Magna Corp*, 484 Mich 300, 306; 773 NW2d 564 (2009).

### B. ANALYSIS

In Michigan, the period of limitations for a defamation claim is one year. MCL 600.5805(9). "A defamation claim accrues when 'the wrong upon which the claim is based was done regardless of the time when damage results.' " *Mitan v Campbell*, 474 Mich 21, 24; 706 NW2d 420 (2005), quoting MCL 600.5827. Here, the allegedly defamatory statements were made on August 21, 2013 and August 22, 2013. Puetz timely filed her complaint in federal court, but her federal complaint was dismissed for lack of subject-matter jurisdiction in June 2015. Puetz declined to appeal the dismissal from federal district court. Subsequently, on July 21, 2015, she filed suit in Michigan, again raising her defamation claim based on Splaine's August 21 and August 22, 2013 statements to ECS. Because her defamation claim was filed more than a year after her claim accrued, it is time-barred unless a tolling provision applies.[2]

In order to bring a state-law claim in federal court, a plaintiff must assert his or her claim under the supplemental jurisdiction statute, 28 USC 1367. Section 1367(a) provides:

---

[2] The parties argue that unless the tolling provision in 28 USC 1367(d) applies to Puetz's defamation claim, that claim is time barred by the one-year statute of limitations in MCL 600.5805(9). However, our general tolling statute, MCL 600.5856(a), would also toll Puetz's claim. See *Badon v Gen Motors Corp*, 188 Mich App 430, 436; 470 NW2d 436 (1991) (holding that if the plaintiff timely files a complaint in federal court, then—under MCL 600.5856—"[t]he statutory period of limitation was then tolled until the federal action was no longer pending").

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, *in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.* Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties. [28 USC 1367(a) (emphasis added).]

Therefore, before a federal court may exercise supplemental jurisdiction over a state-law claim, two requirements must be met. First, there must be a civil action that the federal district court has original jurisdiction over. Second, the state-law claim must be "so related" to the federal claim that it forms "part of the same case or controversy under Article III of the United States Constitution." 28 USC § 1367(a). In this case, the federal district court concluded that Puetz's complaint failed to satisfy the first requirement, i.e., the federal district court lacked original jurisdiction over any of the claims raised in the complaint.[3] Accordingly, because there was no claim over which the federal court had original jurisdiction, the court had no authority under § 1367(a) to exercise supplemental jurisdiction over Puetz's state-law claims.

The supplemental jurisdiction statute does not contain a provision expressly addressing what happens when a state-law claim is dismissed for lack of subject matter jurisdiction under § 1367(a). Instead, "[s]ubsection (b) places limits on supplemental jurisdiction when the district court's original jurisdiction is based only on diversity of citizenship jurisdiction . . . ." *Raygor v Regents of Univ of Minnesota*, 534 US 533, 540; 122 S Ct 999; 152 L Ed 2d 27 (2002). "Subsection (c) allows district courts to decline to exercise supplemental jurisdiction in certain situations" that are not applicable under the facts in this case. *Id.* In addition, subsection (d) appears to toll the limitations period for *any* claim asserted under subsection (a) regardless of whether the plaintiff was successful in asserting that claim. See *Raygor v*, 534 US at 542. Section 1367(d) provides:

(d) The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

---

[3] Puetz contends that Count IV of her federal complaint was a claim over which the court had original jurisdiction. And she argues that the trial court should have reviewed anew the issue of whether the federal court had original jurisdiction over her federal complaint despite the fact that she did not appeal the dismissal in federal court. Puetz, however, cites no authority in support of that novel proposition, so we conclude that this issue was abandoned on appeal. See *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

It is an issue of first impression in Michigan whether 28 USC 1367(d) tolls a state-law claim filed in federal court that is later dismissed for lack of subject-matter jurisdiction. Further, the United States Supreme Court has not addressed this issue, and, although there are a number of state courts and lower federal courts that have addressed the issue, those decisions are not binding on this Court.[4]

In the absence of binding authority interpreting 28 USC 1367(d), we first address the United States Supreme Court decision in *Raygor*. The *Raygor* Court addressed the narrow issue of whether it was constitutionally permissible to apply the tolling provision in § 1367(d) to state-law claims dismissed on Eleventh Amendment grounds. *Raygor*, 534 US at 539, 544. In answering this question, the *Raygor* Court acknowledged that facially § 1367(d) applied to *any* claim asserted under subsection (a). *Id*. at 542. However, the Court stated that "reading subsection (d) to apply when state law claims against nonconsenting States are dismissed on Eleventh Amendment grounds raises serious doubts about the constitutionality of the provision given principles of state sovereign immunity." *Id*. The Court considered it a *constitutional* question given that a limitations period may be a central condition of a state's decision to waive immunity and given that a state can "prescribe the terms and conditions on which it consents to be sued." *Id*. at 542-543 (citation omitted). As a result, the *Raygor* Court relied on the following principle of statutory construction: "When Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Id*. at 543 (quotation marks and citation omitted).

Turning to the statutory language, the *Raygor* Court noted that there was a lack of clarity on whether there was a clear intent to toll the limitations period for claims against nonconsenting defendants that were dismissed on Eleventh Amendment Grounds. *Id*. at 544. As a result, although the language "any claim asserted" was broad enough to cover the situation in *Raygor*, it was "not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment" because it did not reflect any "specific or unequivocal intent to toll the statute of limitations for claims asserted against nonconsenting States." *Id*. at 544-545. Moreover, although the statute could be read to authorize tolling of claims dismissed against nonconsenting State defendants on Eleventh Amendment grounds, in context 28 USC 1367 only contemplates a few grounds for dismissal. *Id*. at 545. The Court stated:

> The requirements of § 1367(a) make clear that a claim will be subject to dismissal
> if it fails to "form part of the same case or controversy" as a claim within the
> court's original jurisdiction. Likewise, § 1367(b) entails that certain claims will

---

[4] See *Abela v Gen Motors Corp*, 469 Mich 603, 606; 677 NW2d 325 (2004) (stating that when construing federal statutes, state courts must follow the decisions of the United States Supreme Court, but the decisions of lower federal courts are merely persuasive), and *K & K Constr, Inc v Dep't of Environmental Quality*, 267 Mich App 523, 559 n 38; 705 NW2d 365 (2005) (stating that although not binding, decision of courts from other states may be considered as persuasive authority).

be subject to dismissal if exercising jurisdiction over them would be "inconsistent" with 28 USC § 1332. Finally, § 1367(c) lists four specific situations in which a district court may decline to exercise supplemental jurisdiction over a particular claim. Given that particular context, it is unclear if the tolling provision was meant to apply to dismissals for reasons unmentioned by the statute, such as dismissals on Eleventh Amendment grounds. In sum, although § 1367(d) may not clearly exclude tolling for claims against nonconsenting States dismissed on Eleventh Amendment grounds, we are looking for a clear statement of what the rule *includes*, not a clear statement of what it *excludes*. Section 1367(d) fails this test. As such, we will not read § 1367(d) to apply to dismissal of claims against nonconsenting States dismissed on Eleventh Amendment grounds. [*Id*. at 545-546 (citations omitted).]

Overall, *Raygor* contains language suggesting that § 1367(d) may apply only to dismissals contemplated by § 1367(a), (b), and (c), but it also contains language making clear that the interpretation of § 1367(d) was driven by constitutional concerns that are not relevant to the issue in the case sub judicie.

Relying on the *Raygor* decision, the Arizona court of appeals held that if a federal court dismissed a state-law claim for lack of subject matter jurisdiction premised on a lack of original jurisdiction, then the tolling provision in § 1367(d) does not apply to a plaintiff's claims when they are refiled in state court. *Morris v Giovan*, 225 Ariz 582; 242 P3d 181 (Ariz App, 2010). The *Morris* court concluded that there was no real distinction between a claim dismissed against nonconsenting defendants on Eleventh Amendment grounds and a claim dismissed for lack of subject matter jurisdiction. See *id*. at 584. Further, the court believed that holding otherwise would "affect the constitutional balance between the states and the federal government, and Congress has not expressed this intent in the language of the statute." *Id*. at 585, citing *Raygor*, 534 US at 543.

The trial court in this case found *Morris* persuasive and applied it to bar Puetz's defamation claim. We conclude, however, that the court's reliance on *Morris* was misplaced. The *Morris* court did not independently evaluate the statutory language. Instead, it relied on the *Raygor* Court's interpretation of § 1367(d), which was an interpretation of the statute *in light of the dismissal of a claim on Eleventh Amendment grounds*. *Morris*, 225 Ariz at 584; *Raygor*, 534 US at 542. Then, without citation to legal authority, the *Morris* court presumed that the same constitutional concerns that existed in *Raygor* were present when a case is dismissed for want of subject-matter jurisdiction. See *Morris*, 225 Ariz at 585. Finally, the *Morris* court did not acknowledge that, in *Jinks v Richland Co, SC*, 538 US 456, 466; 123 S Ct 1667; 155 L Ed 2d 631 (2003), the United States Supreme Court declined to extend the holding in *Raygor* in the absence of Eleventh Amendment concerns. For these reasons, we do not find *Morris* persuasive.

Instead, we turn to the language used in 28 USC 1367(d) and the rules of interpretation espoused by our own Supreme Court in *Walters v Nadell*, 481 Mich 377; 751 NW2d 431 (2008). In that case, our Supreme Court explained that

when interpreting a federal statute our task is to give effect to the will of Congress. To do so, we start, of course, with the statutory text, and unless

otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning. When the words of a statute are unambiguous, judicial inquiry is complete. [*Id.* at 381-382 (quotation marks, alterations, and citations omitted).]

28 USC 1367(d) provides that its tolling provision applies to "any claim asserted under subsection (a)." The term " '[a]ny' means 'every; all.' " *Nat'l Pride At Work, Inc v Governor*, 481 Mich 56, 77; 748 NW2d 524 (2008) (citation omitted). Therefore, applying the statute as written, because Puetz asserted a claim under § 1367(a), her claim was tolled under § 1367(d).[5]

Applying the statute as written is also in line with Congress's intent when enacting the statute. As explained by the United States Supreme Court in *Jinks*, § 1367(d) was enacted "[t]o prevent the limitations period on [dismissed] claims from expiring while the plaintiff was fruitlessly pursuing them in federal court." The *Jinks* Court further stated:

Prior to enactment of § 1367(d), [plaintiffs] had the following unattractive options: (1) They could file a single federal-court action, which would run the risk that the federal court would dismiss the state-law claims after the limitations period had expired; (2) they could file a single state-law action, which would abandon their right to a federal forum; (3) they could file separate, timely actions in federal and state court and ask that the state-court litigation be stayed pending resolution of the federal case, which would increase litigation costs with no guarantee that the state court would oblige. Section 1367(d) replaces this selection of inadequate choices with the assurance that state-law claims asserted under § 1367(a) will not become time barred while pending in federal court. [*Id.* at 463-464.]

Similarly, the United States Supreme Court recently explained that the supplemental jurisdiction statute was enacted because "Congress sought to clarify the scope of federal courts' authority to hear claims, appreciating that supplemental jurisdiction has enabled federal courts and litigants to . . . deal economically—in a single rather than multiple litigation—with related matters." *Artis v District of Columbia*, 583 US ___, ___; 138 S Ct 594, 598; 199 L Ed 2d 473 (2018) (quotation and citation marks omitted).

---

[5] Other courts have applied the plain language of the statute to conclude that a dismissal for lack of subject-matter jurisdiction does not bar application of the tolling provision in 28 USC 1367(d). See *Krause v Textron Fin Corp*, 59 So 3d 1085, 1090 (Fla. 2011) (holding that the mere fact that a dismissal was based on lack of subject-matter jurisdiction does not change the plain and unambiguous language of the tolling provision in 28 USC 1367(d)); *Stevens v Arco Mgt of Washington DC, Inc*, 751 A2d 995, 998 (DC Court of Appeals, 2000) (holding that 28 USC 1367(d) does not limit its application to conditional dismissals under § 1367(c) and instead applied to *any claim asserted* under § 1367(a) regardless of whether that assertion was successful or unsuccessful).

Moreover, three purposes of statutes of limitation are (1) to afford security against fraudulent or stale claims that become difficult to defend due to the loss of evidence, (2) to relieve the courts from dealing with stale claims, and (3) to protect potential defendants from protracted fear of litigation. *Moll v Abbott Laboratories*, 444 Mich 1, 14; 506 NW2d 816 (1993). Here, because the case was filed in federal district court, the purpose of the statute of limitations was, in effect, satisfied insofar as no evidence was lost and Spectrum had notice of the claim against it. Furthermore, although we recognize that exceptions to limitations periods are generally strictly construed, *Mair v Consumers Power Co*, 419 Mich 74, 80; 348 NW2d 256 (1984), that does not mean that they must be interpreted contrary to their plain meaning.

For the foregoing reasons, we hold that 28 USC 1367(d) tolled Puetz's defamation claim notwithstanding that her federal claim was dismissed for lack of subject-matter jurisdiction.[6]

## III. DISMISSAL UNDER MCR 2.116(C)(10)

### A. STANDARD OF REVIEW

Puetz also argues that the trial court erred by dismissing her claims for false light invasion of privacy, breach of contract, and tortious interference with a business expectancy. In reviewing a motion for summary disposition under MCR 2.116(C)(10), a court considers "affidavits, pleadings, depositions, admissions, and other documentary evidence submitted by the parties in the light most favorable to the party opposing the motion." *Greene v A P Prods, Ltd*, 475 Mich 502, 507; 717 NW2d 855 (2006) (quotation marks and citations omitted). The motion for summary disposition "tests the factual support for a claim and should be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *MEEMIC Ins Co v DTE Energy Co*, 292 Mich App 278, 280; 807 NW2d 407 (2011). A genuine issue of material fact exists if the record, viewed in a light most favorable to the nonmoving party, establishes a matter in which reasonable minds could differ. *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008). Further, the court may not make factual findings on disputed factual issues during a motion for summary disposition and may not make credibility determinations. *Burkhardt v Bailey*, 260 Mich App 636, 647; 680 NW2d 453 (2004).

### B. ANALYSIS

### 1. FALSE LIGHT—INVASION OF PRIVACY

An invasion of privacy claim protects against four types of invasion of privacy: "(1) intrusion upon the plaintiff's seclusion or solitude or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity that places the plaintiff in a false

---

[6] Spectrum argues that even if summary disposition was improper under MCR 2.116(C)(7), there was no genuine question of material fact on the merits of the claim, so summary disposition would have been proper under MCR 2.116(C)(10). However, as the trial court did not rule on that argument, we will not address it on appeal.

light in the public eye; and (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness." *Doe v Mills*, 212 Mich App 73, 80; 536 NW2d 824 (1995). In this case, Puetz's claim is based on the third type: false light. "In order to maintain an action for false-light invasion of privacy, a plaintiff must show that the defendant broadcast to the public in general, or to a large number of people, information that was unreasonable and highly objectionable by attributing to the plaintiff characteristics, conduct, or beliefs that were false and placed the plaintiff in a false position." *Duran v Detroit News, Inc*, 200 Mich App 622, 631-632; 504 NW2d 715 (1993). Further, "the defendant must have known of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed." *Detroit Free Press, Inc, v Oakland Co Sheriff*, 164 Mich App 656, 666; 418 NW2d 124 (1987); *Early Detection Ctr, PC, v New York Life Ins Co*, 157 Mich App 618, 630; 403 NW2d 830 (1986).

Puetz's complaint does not clearly identify the statements that she contends placed her in a false light. Her complaint provides:

> 77. The statements of Spectrum placed [Puetz] in a false light to her peers within the hospital, outside hospital as well as with other staff within Spectrum.

> 78. Spectrum set in motion communications to the media that a physician was fired for a HIPAA violation and encouraged invasion of her privacy.

> 79. This cause of action protects [Puetz's] right to be left alone and not have private facts shared about her to third parties who have no duty to know.

> 80. Statements by Spectrum that placed [Puetz] in a false light would be highly offensive and objectionable to a reasonable person.

> 81. [Puetz] was injured and suffered shame, embarrassment and humiliation by the actions of Spectrum. Her injuries are ongoing because the websites for the media are disseminated continuously on the Internet.

> 82. As a direct and proximate result of Defendant Spectrum's conduct, [Puetz] has suffered loss of privacy, loss of reputation, emotional distress, embarrassment, ridicule and humiliation.

Wholly missing from Puetz's pleading is an identification of who disseminated information about her, when that information was given, and what was actually said about her that placed her in a false light. Based solely on the pleadings, it is likely that a motion for summary disposition under MCR 2.116(C)(8) (failure to state a claim) would have been viable. However, the trial court reviewed this claim under MCR 2.116(C)(10) and permitted Puetz to clarify the factual basis for this claim at oral argument on the motion for summary disposition. We, therefore, address this claim in light of the clarification.

Puetz contends that her false light claim is based on statements that Splaine made to ECS on August 21, 2013 and on August 22, 2013. The trial court concluded that these statements were not actionable as a matter of law because any information Splaine provided at the meeting was not "publicized." A claim for false light invasion of privacy requires that the plaintiff

-9-

receive publicity. *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 385; 689 NW2d 145 (2004). Publicity can be shown if the defendant "broadcast [the challenged information] to the public in general, or to a large number of people." *Duran*, 200 Mich App at 631-632. "Broadcast" means "to make widely known." *Merriam–Webster's Collegiate Dictionary* (11th ed). Therefore, summary disposition is appropriate when the communication is only published to a small or specific group of individuals. See *Derderian*, 263 Mich App at 387 ("Even construing Dr. Rogers's list of medical personnel as the 'public' to whom the information was broadcast, plaintiffs have not demonstrated a sufficient level of publicity . . ."); *Dzierwa v Mich Oil Co*, 152 Mich App 281, 288; 393 NW2d 610 (1986) (holding that the plaintiff's false light claim failed because the communications occurred only in the presence of other employees or, at most, a handful of office visitors); *Hall v Pizza Hut of America, Inc*, 153 Mich App 609, 618; 396 NW2d 809 (1986) (stating that the plaintiff's false light claim failed where the actionable communication consisted of one telephone call); *Sawabini v Desenberg*, 143 Mich App 373, 380-381; 372 NW2d 559 (1985) (holding that a letter from a physician to a lawyer was not disseminated to public in general or large number of people).

With regard to the comments made by Splaine in the August 22, 2013 letter, Puetz has provided no evidence that the information in it was distributed to a large number of people or the public in general. The letter was addressed to ECS "Attn: Kenneth S. Johnson, MD" and was copied to ECS's lawyer, and three employees at Spectrum. Therefore, it appears that Spectrum "broadcast" the letter to only 5 people who were involved in the incident management.[7] Like the plaintiff in *Derderian*, 263 Mich App at 387, Puetz simply has failed to demonstrate a sufficient level of publicity with regard to the letter. Instead, she merely speculates that the letter could have been widely disseminated because it was not marked "confidential." Without proof that it was disseminated further, however, the trial court did not err by dismissing her false light claims based upon the letter.

The next component of the false light claim is premised on Splaine's comments at the August 21, 2013 meeting. Puetz asserts that at the meeting, Splaine told ECS's members that she violated HIPAA and that Splaine called her conduct reprehensible, egregious, unprofessional, and lacking in integrity. At the meeting Splaine allegedly disclosed false information about Puetz to a group of 50 to 60 people. Despite the large size of the group, the trial court relied on *Derderian* for the proposition that disclosure to a "medical executive committee/team" does not satisfy the publicity element of a false light claim. See *id*. at 388. In *Derderian*, however, unlike the present case, the plaintiffs failed to provide adequate factual support for their claim that any "publication was made to a sufficiently large group of people."

---

[7] An official letter explaining Spectrum's position was not unwarranted. It is also reasonable to conclude that as the president of ECS, Johnson needed to receive the letter and that it should have been copied to ECS's lawyer. Further, Kathy Van Rhee was the head of nursing in the emergency room and worked with Puetz. She was one of the individuals involved. Thus, at best, the letter was copied to two individuals who had no apparent reason to be copied. Sending the letter to two people who (arguably) should not have received it does not establish a sufficient level of publicity.

*Id*. Here, given that there is factual support for Puetz's claim that the disclosure was made to 50 to 60 people, and given that a jury could reasonably infer that to be a large group of people so as to satisfy the publication requirement, we conclude that the trial court erred by finding there was no genuine issue of material fact on the publicity element of Puetz's false light claim with regard to the statements made at the August 21, 2013 meeting.

The second element of a false light claim is that the comments must be "unreasonable and highly objectionable" because they attributed to the plaintiff "characteristics, conduct, or beliefs that were false and placed the plaintiff in a false position." See *Duran*, 200 Mich App at 632. The trial court did not reach this element because it granted summary disposition based on a lack of publicity. Puetz contends there is a factual dispute on this point because Splaine stated at the ECS meeting that she violated HIPAA. Spectrum argues, however, that Splaine never referred to Puetz by name at the meeting, so Puetz cannot prove that Splaine attributed a HIPAA violation to her at the meeting. We disagree. The record reflects that the attendees of the ECS meeting were aware of the Facebook incident, those involved, and the discipline imposed, it is reasonable to infer that they knew Splaine was referring to Puetz when he spoke at the meeting. Consequently, we conclude that there are fact questions about whether Splaine told ECS that Puetz violated HIPAA.

The next question is whether there is a fact question regarding whether the communication of that information, i.e. the attribution of a HIPAA violation to Puetz, was false and placed her in a false light. We note that whether Puetz's comments violated HIPAA could be determined as a matter of law. However, it is not necessary to take that step because in order to establish a false light claim, a plaintiff must establish that when the defendant disseminated the information, it was done with actual knowledge or reckless disregard of the truth or falsity of the publicized matter. *Detroit Free Press, Inc*, 164 Mich App at 666. Here, the record reflects that before Splaine spoke at the ECS meeting, he had ongoing discussions with Spectrum's lawyers and others involved in the decision making process about whether the Facebook incident was a violation of HIPAA. Further, he testified that based on his own compliance training, he was aware that identifying a patient by his or her initials is part of what constitutes a patient identifier for HIPAA purposes. In addition, several witnesses testified at length about the rationale behind the discipline imposed. Specifically, if the Facebook post demonstrated knowledge that the individual commenting knew the woman depicted was a patient, then the person making that comment was terminated or prohibited from practicing at Spectrum. Therefore, Puetz has directed this Court to no evidence showing that when Splaine made his comments, he either knew his comments were false or he recklessly disregarded the possibility that they were false. Stated differently, even if Puetz could establish that unreasonable and highly objectionable information was publicized to a large group of people, she cannot establish that when he spoke at the ECS meeting, Splaine "must have known of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed." *Id*. As a result, although the court's reasoning was flawed, the trial court did not err by dismissing Puetz's false light claim to the extent that it was based upon Splaine's comments at the August 21, 2013 meeting.

Finally, Puetz argues that her false light claim should be allowed to proceed because Spectrum, ECS, and "some doctors" knew who Puetz was, and then, one day she opened her door and a reporter was there asking if she was terminated for a Facebook comment. Puetz's

lawyer represented to the trial court that type of result did not come about "without that information being publicized," but when asked by the court to show "anything in the report that supports your supposition that anyone at Spectrum gave that information out," Puetz's lawyer candidly admitted that "we can't." In its opinion granting summary disposition on this claim, the trial court noted that "the record is bereft of evidence that Spectrum took any actions to notify the media of its disciplinary actions" and that the court could not "presume that Spectrum leaked any information to the press." In the absence of any evidence in support of this claim, we conclude the trial court did not err by dismissing this aspect of the false light claim.

In sum, Puetz's false light claim was premised on three separate incidents: the letter to ECS, the statements made at the ECS meeting, and statements made to the media about Puetz. The letter, however, is not actionable because there is no genuine issue of material fact with regard to whether it was publicized. The statements to the media are not actionable because there is, in fact, no evidence that Spectrum made any false statement to the media about Puetz. Finally, although the trial court erred by finding no genuine issue of fact with regard to whether the statements at the ECS meeting were publicized, Puetz cannot establish that Splaine made the statements with actual knowledge or reckless disregard of the truth or falsity of the publicized matter. *Detroit Free Press, Inc*, 164 Mich App at 666. Thus, despite there being a fact question on some of the elements of the false light claim, Puetz's failure to establish the final element is fatal to her claim, and the trial court did not err by dismissing it.

For the foregoing reasons, the trial court did not err by dismissing this claim under MCR 2.116(C)(10).

## 2. BREACH OF CONTRACT

The trial court also erred by dismissing Puetz's intellectual property ownership claim, which was based on a breach-of-contract theory. The trial court held that as a matter of law all of the agreements Puetz signed bound her to follow Spectrum's policies and procedures, including Spectrum's intellectual property policy. The court further found that under the broad language of the intellectual property policy, Spectrum owned the disputed observation materials. On appeal, Puetz contends that the trial court erred by finding she was bound by the intellectual property policy.

"In Michigan, the essential elements of a valid contract are (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Thomas v Leja*, 187 Mich App 418, 422; 468 NW2d 58 (1991). Here, the trial court relied upon three contracts: a 2008 clinical services agreement, a 2009 medical director services agreement, and a 2012 pediatric clinical services agreement. However, the language of the contracts makes it apparent that Puetz was not a party to the contracts and her signature on the agreements did not represent her intent to be bound by the terms set forth in them. Instead, the parties were Spectrum and ECS, who were named parties, signed as parties, and referred to as parties throughout the contracts. Because Puetz was not a party to the contracts and because there is no evidence before this Court that she separately agreed to be bound by the agreements, the trial court erred by concluding she was bound by the 2008, 2009, and 2012 provisions providing that she would conform with Spectrum's IP policy.

We note that there are also several problems with the dates of the agreements. The 2008, 2009, and 2012 agreements refer to "this agreement," indicating that they apply to services performed under each respective contract. Puetz testified that she started developing her observation materials in 2003, which is about five years before she signed the 2008 clinical services agreement, about six years before the 2009 agreement, and about nine years before she signed the 2012 agreement. Given that the contracts purportedly binding her to the IP policy were not in place when she started developing the content, it is impossible for all of the development of the observation materials to have been done under "this agreement." Moreover, a copy of the IP policy in effect in 2003 is *not* included in the lower court record. Instead, the record indicates that the IP policy was put into effect in June 2006. It was revised in June 2010 and again in October 2012. Section 2.3.3.3 of the 2012 version of the IP policy provided that, "[a]ny Intellectual Property developed by an Associate prior to his or her relationship with Spectrum Health shall not be owned by Spectrum Health, except to the extent that a Derivative Work of such Intellectual Property is developed during the Associate's relationship with Spectrum Health and otherwise meets the qualifications for ownership by Spectrum Health set forth in Section 2.3. above." In addition, the 2010 version of the policy had the same type of limitation. Accordingly, at a minimum, viewing the evidence in the light most favorable to Puetz, it appears that there are factual questions about whether some of the materials were developed before the IP policy was in place and before Puetz signed any contract potentially binding her to conform to the policy.[8]

For the foregoing reasons, the trial court erred by dismissing this claim under MCR 2.116(C)(10).

### 3. TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY

In order to succeed on a claim of tortious interference with a business expectancy, a plaintiff must establish "the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resulting damage to the plaintiff." *Dalley v Dykema Gossett PLLC*, 287 Mich App 296, 323; 788 NW2d 679 (2010). Further, in order to satisfy the third element, the plaintiff must establish that the defendant "acted both intentionally and either improperly or without justification." *Id*. If the defendant's act was motivated by legitimate business reasons, then the act does not "constitute improper motive or interference." *Id*. at 324. Finally, the plaintiff must demonstrate that the defendant "did something illegal, unethical, or fraudulent." *Id*.

The record reflects that multiple individuals who commented on the Facebook post were disciplined. In addition, although not everyone who posted on the Facebook page were terminated or prohibited from working at Spectrum, the record reflects that Puetz and three or four others were either terminated or prohibited from working at Spectrum Hospitals. Thus,

---

[8] According to Puetz's copyright registration forms, she completed work on part of the materials in 2011 and on another part of the materials in 2012. Thus, when completed, the IP policy was clearly in place, as were at least some of the contracts Puetz signed.

although Puetz can establish that Spectrum intentionally interfered with her relationship with ECS by instructing ECS to not schedule her at any Spectrum facility, she cannot establish that Spectrum acted improperly or without justification, given that Spectrum also terminated or disciplined others involved in the Facebook incident. Further, given the impropriety of Puetz's comments on Facebook, there is nothing to suggest that Spectrum was acting illegally, unethically, or fraudulently when it sought to prevent her from being employed in its hospitals.

Moreover, although Puetz speculates that Spectrum had an improper motive when it interfered with her relationship with ECS, she cannot direct this Court to anything other than her own suspicions. Splaine testified that he did not know about Puetz's intellectual property dispute before he reached the decision to prohibit her from working at Spectrum. Puetz offered no evidence to counter that testimony, other than speculation that his direct supervisor probably knew about the dispute and may have influenced him. Further, Puetz has offered no evidence to contradict Splaine's testimony that the rationale behind the discipline imposed was based on whether or not the individual who commented on the Facebook post was aware or unaware that the woman depicted was a patient. Consequently, Puetz has failed to support this claim, and the trial court did not err by dismissing it under MCR 2.116(C)(10).

## IV. CONCLUSION

In sum, we reverse the trial court's decision to dismiss Puetz's defamation claim because under the language in 28 USC 1367(d) the limitations period was tolled. We also reverse the court's decision to dismiss Puetz's breach-of-contract claim because there is a genuine issue of material fact with regard to whether Puetz agreed to be bound by Spectrum's IP policy. However, we affirm the court's decision to dismiss Puetz's claim for false light and her claim for tortious interference with a business expectancy.

Affirmed in part and reversed in part. We do not retain jurisdiction. No taxable costs, neither party having prevailed. MCR 7.219(A).

/s/ Michael J. Kelly
/s/ Jane E. Markey
/s/ Thomas C. Cameron

-14-