*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

HERITAGE PHARMACY SERVICES, INC.,

        Plaintiff-Appellant,

v

ONECARE LTC, LLC, PIERRE BOUTROS, and
HANY BOUTROS,

        Defendants-Appellees,

and

ST. JAMES NURSING & PHYSICAL
REHABILITATION CENTER, INC., doing business
as ST. JAMES NURSING CENTER, CADILLAC
NURSING HOME, INC., doing business as ST.
FRANCIS NURSING CENTER, MISSION POINT
MANAGEMENT SERVICES, LLC, H. ROGER
MALI, and BRADLEY MALI,

        Defendants.

UNPUBLISHED
May 08, 2026
10:18 AM

No. 374560
Wayne Circuit Court
LC No. 19-014315-CB

Before: BAZZI, P.J., and BOONSTRA and SWARTZLE, JJ.

PER CURIAM.

In this tortious interference action, plaintiff appeals as of right the trial court's order granting summary disposition in favor of defendants, OneCare LTC, LLC (OneCare), Pierre Boutros (Pierre), and Hany Boutros (Hany) (collectively, defendants),[1] under MCR 2.116(C)(10)

---

[1] Because St. James Nursing & Physical Rehabilitation Center, Inc., doing business as St. James Nursing Center, Cadillac Nursing Home, Inc., doing business as St. Francis Nursing Center, Mission Point Management Services, LLC, H. Roger Mali, and Bradley Mali are not involved in the present appeal, all references to defendants solely pertain to One Care, Pierre, and Hany.

(no genuine issue of material fact), and denying plaintiff summary disposition under MCR 2.116(I)(2) (opposing party entitled to judgment). We affirm.

I.    BASIC FACTS AND PROCEDURAL HISTORY

Plaintiff operates a pharmacy, which in part, provides pharmaceutical products and services to individuals residing in congregate living facilities. H. Roger Mali (Roger) and Bradley Mali (Bradley) served as the principals for St. James Nursing & Physical Rehabilitation Center, Inc., doing business as St. James Nursing Center, Cadillac Nursing Home, Inc., doing business as St. Francis Nursing Center (collectively Saint Facilities), and Mission Point Management Services, LLC (Mission Point). Hany and Pierre were the principals for OneCare, a pharmaceutical entity.

On February 25, 2015, plaintiff entered into five-year pharmacy services agreements with the Saint Facilities, with plaintiff administering various pharmaceutical products and services in exchange for payment consistent with an agreed-upon pricing formula. Regarding termination, the pertinent agreements stated:

**C1.  Term**

Unless terminated earlier in accordance with paragraph 2 (Termination) below, the Pharmacy Services Agreement shall be for a term of five (5) years commencing on February 25th, 2015, at 12 [a.m.], and ending on March 1, 2020, at 12 midnight. (Initial Term) This agreement will automatically renew for additional periods of one (1) year unless either party provides written notice to the other at least thirty (30) days prior to the end of the initial term or a renewal term of it desire to terminate the Pharmacy Services Agreement. Written notice of intent by Facility not to renew is valid only if all outstanding payments due Pharmacy are current.

**C2.  Termination**

Either party may terminate this agreement on not less than thirty (30) days written notice with cause. Written notice by Facility is valid with cause only if all outstanding payments are current. Any liability caused by breach of this agreement is not cured by the termination of the agreement. Upon termination, the Facility shall return all equipment, documents, manuals, emergency kits, and other materials belonging to Pharmacy. Facility shall pay any outstanding invoices to Pharmacy within thirty (30) days of termination. In the event of filing of bankruptcy by Facility, the Pharmacy shall have the option to terminate this contract by giving Facility thirty (30) days written notice.

Following the execution of the agreements, Roger and Bradley requested "a substantial working capital loan to assist them in their various business operations" from plaintiff in late 2015 or early 2016, which plaintiff declined to fulfill.

In 2016, the Saint Facilities filed for bankruptcy, and despite being ordered to issue payments to plaintiff, the Saint Facilities failed to disburse the required funds to plaintiff. During the pendency of the bankruptcy proceedings, plaintiff inquired when it would be able to provide services to a separate Mission Point facility, but plaintiff was informed that the contract was issued

to OneCare. OneCare purportedly acquired the contract because Pierre and Hany provided the necessary funding to renovate the Mission Point facility in exchange for pharmacy services contract. Roger and Bradley required further capital for the reorganization of the Saint Facilities, and they sought such funding "with the not-so-veiled threat that if [plaintiff] did not participate (and another pharmacy services provider did), the other provider would take over the accounts serviced by [plaintiff], as quid pro quo, for the substantial investment needed by Mali/Mission." Plaintiff again denied providing the demanded capital. However, defendants allegedly did so, resulting in a request that plaintiff voluntarily terminate its pharmacy service agreements by March 1, 2017. When plaintiff sought clarification regarding the termination of these contracts, Roger allegedly contended that defendants required the pharmacy service contracts in return for the provided funding.

When plaintiff declined to voluntarily terminate its service agreements, and instead, necessitated that the five-year term be fulfilled, there were notices posted at the Saint Facilities on February 13, 2017, informing the residents that OneCare would be administering pharmaceutical services moving forward. On February 27, 2017, plaintiff's counsel sent a cease-and-desist letter to defendants stating that plaintiff was aware that defendants were attempting to conduct business at the Saint Facilities, but their attempt to "provide pharmacy services at each of the Nursing Centers constitutes tortious interference with [plaintiff']s valid contracts that has caused, and will continue to cause[] damage to [plaintiff]." The letter further provided that plaintiff had "valid and binding agreements to perform pharmacy services at each of the Nursing Centers and [had] performed under those agreements for years," and plaintiff was not in default "under any of its agreements and the Nursing Centers [had] not terminated any of the agreements." Pursuant to the letter, plaintiff demanded that defendants immediately cease and desist from interfering with its business relationships and expectancies. Defendants, however, began providing pharmaceutical services at the Saint Facilities on March 1, 2017, resulting in plaintiff allegedly suffering damages in excess of $6 million.

Plaintiff subsequently filed a complaint advancing tortious interference with contractual relations and tortious interference with a business relationship or expectancy claims against defendants. Defendants moved for summary disposition under MCR 2.116(C)(10), arguing that plaintiff was unable to establish that defendants "did anything to unjustifiably instigate or induce the Saint Facilities to breach their contracts with [plaintiff]," rather, plaintiff's representative testified that it was plaintiff's refusal to provide funding that resulted in the termination of the subject contracts. Defendants further contended that plaintiff could not demonstrate defendants acted with the intent to induce the Saint Facilities' breach because the record indicated defendants had no knowledge regarding the preexisting agreement between the parties. Defendants additionally asserted that while plaintiff "alleges quid pro quo, there is no evidence of [quid] pro quo, nor any other evidence that [defendants] intended to induce the facilities to terminate [plaintiff]." Defendants also advanced that defendant's failure to abide by the cease-and-desist letter did not constitute proof that defendants instigated the breach, rather, the evidence demonstrated the Saint Facilities previously decided to terminate their contracts with plaintiff.

Plaintiff responded, arguing that it was entitled to summary disposition under MCR 2.116(I)(2) because the record plainly demonstrated that defendants "are liable for tortious interference of the Agreements because they knew (and decided to ignore) their conduct interfered with [plaintiff's] Agreements and business relationships with the Saint Facilities." Plaintiff further

asserted that even if defendants "had mistaken belief that Mali/Mission properly terminated the Agreements (but in fact they were not), they still are liable to [plaintiff] for tortious interference." Plaintiff additionally contended that defendants' receipt of the cease-and-desist letter indicated that they were cognizant of their interference before defendants were set to provide services to the Saint Facilities on March 1, 2017. Plaintiff also averred that defendants' conduct was "calculated and wrongful" because they provided the requested capital to the Saint Facilities in exchange for the pharmacy service contracts. Plaintiff alleged that defendants acknowledged that they placed pressure on Roger and the Saint Facilities to acquire the pharmacy service agreements.

Defendants replied, "that the testimony about pressure was on the topic of scheduling the important date [regarding] when OneCare must be expected to begin providing services to the facilities," as opposed to defendants pressuring the Saint Facilities into the pharmacy service agreements. Defendants further argued that "nothing in [plaintiff's] Response cites to any document, communication, or any direct evidence whatsoever that shows that OneCare demanded the facilities contracts in quid pro [quo] arrangement in order to make the loan." Defendants additionally asserted that plaintiff "cites to no evidence whatsoever showing that [it] sustained damages."

On September 13, 2022, the trial court held a hearing regarding the parties' pending motions; the parties advanced arguments consistent with their respective filings. Following the parties' arguments, the court opined:

> I'm granting the motion cause I believe the e-mails, deposition and the other evidence do not rise to the level of illegal, unethical or improper conduct in this case. I don't think that the Defendants were dictating. I think they—as [defense counsel] pointed out, I think there is reasonable explanation that they were just trying to make sure that the services continue.
>
> There is not reasonable likelihood or any inference that the e-mails or that they were intentionally interfering with the contract or the business expectancy. And for that reason and those others the Court's mentioned, the Court's granting the motion.

The court further clarified that it was denying plaintiff summary disposition under MCR 2.116(I)(2). On September 15, 2022, the trial court entered an order granting summary disposition to defendants under MCR 2.116(C)(10), denying plaintiff summary disposition pursuant to MCR 2.116(I)(2), and dismissing plaintiff's claims of tortious interference with contractual relations and tortious interference with business relationships or expectancies against defendants with prejudice. This appeal followed.

## II.     STANDARDS OF REVIEW

This Court reviews de novo a trial court's decision whether to grant a motion for summary disposition. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159-160; 934 NW2d 665 (2019). Summary disposition pursuant to MCR 2.116(C)(10) is proper when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). A motion

-4-

pursuant to MCR 2.116(C)(10) assesses the factual sufficiency of a claim. *El-Khalil*, 504 Mich at 159-160. "When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id.* at 160. "A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact." *El-Khalil*, 504 Mich at 160. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id.*, quoting *Johnson v VanderKooi*, 502 Mich 751, 761; 918 NW2d 785 (2018) (quotation marks and citation omitted).

Under MCR 2.116(I)(2), the trial court may grant summary disposition in favor of the party opposing summary disposition "[i]f it appears to the court that the opposing party, rather than the moving party, is entitled to judgment." When a party moves for summary disposition under MCR 2.116(C)(10), and the trial court grants summary disposition in favor of the opposing party under MCR 2.116(I)(2), this Court employs the standard of review for a motion under MCR 2.116(C)(10). *Cadillac Rubber & Plastics*, *Inc v Tubular Metal Sys*, *LLC*, 331 Mich App 416, 421-422; 952 NW2d 576 (2020). "If, after careful review of the evidence, it appears to the trial court that there is no genuine issue of material fact and the opposing party is entitled to judgment as a matter of law, then summary disposition is properly granted under MCR 2.116(I)(2)." *Id.* at 422 (quotation marks and citation omitted).

III. ANALYSIS

Plaintiff argues that the trial court erroneously granted summary disposition, and denied plaintiff summary disposition, as to plaintiff's tortious inference claims. We disagree.

Michigan distinguishes between claims for tortious interference with contractual relations and tortious interference with a business relationship or expectancy as follows:

> In Michigan, tortious interference with a contract or contractual relations is a cause of action distinct from tortious interference with a business relationship or expectancy. The elements of tortious interference with a contract are (1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant. The elements of tortious interference with a business relationship or expectancy are (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted. [*Health Call of Detroit v Atrium Home & Health Care Servs*, *Inc*, 268 Mich App 83, 89-90; 706 NW2d 843 (2005) (citations omitted).]

The parties do not dispute that the first and second elements of the tortious inference claims are satisfied. Rather, the dispute centers on whether a genuine issue of material fact exists as to the third element under either theory of tortious interference.

Regarding the third element of tortious interference with a contract—an unjustified instigation of the breach by the defendant—this Court has explained that "the party alleging

tortious interference with a contractual relationship must allege the 'intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law' for the purpose of invading the contractual rights of another." *Int'l Outdoor*, *Inc v SS Mitx*, *LLC*, 349 Mich App 212, 237; 27 NW3d 365 (2023), quoting *Relative Time Films*, *LLC v Covenant House Mich*, 344 Mich App 155, 162; 999 NW2d 64 (2022) (quotation marks and citation omitted). As this Court previously detailed, "A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any circumstances." *Knight Enterprises v RPF Oil Co*, 299 Mich App 275, 280; 829 NW2d 345 (2013) (quotation marks and citations omitted). "If the defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference." *Relative Time Films*, *LLC*, 344 Mich App at 162 (quotation marks and citation omitted).

Stated alternatively, in order to prevail on a claim for tortious interference with a contract, plaintiff had to prove either that defendants committed an act that was so wrongful that defendants had no justification whatsoever for committing that act, and did so with malice and the intent to induce Roger or Bradley to breach their contracts as it relates to the Saint Facilities and Mission Point. *Knight Enterprises*, 299 Mich App at 280. "Thus, it is an essential element of a claim of tortious interference with a contract that the defendant unjustifiably instigated or induced the party to breach its contract." *Id*. at 281 (quotation marks and citation omitted). This Court has further explained:

> The essential thing is the purpose to cause the result. If the actor does not have this purpose, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other. It is not necessary, however, that the purpose to cause the breach of contract or failure to deal be the actor's sole or paramount purpose. It is sufficient that he designs this result whether because he desires it as an end in itself or because he regards it as a necessary, even if regrettable, means to some other end. *[Id*. (quotation marks and citation omitted).]

As to tortious inference with a business relationship or expectancy, to establish the third element—an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy—"the plaintiff must establish that the defendant acted both intentionally and either improperly or without justification." *Puetz v Spectrum Health Hosps*, 324 Mich App 51, 78; 919 NW2d 439 (2018) (quotation marks and citation omitted). There are two different means of establishing that a defendant acted improperly or without justification: a plaintiff must show either "the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the . . .business relationship of another." *CMI Intern*, *Inc v Intermet Intern Corp*, 251 Mich App 125, 131; 649 NW2d 808 (2002) (quotation marks and citation omitted).

Plaintiff fails to establish that defendants instigated a breach of the pharmacy service agreements or the business relationship or expectancy, or intentionally induced Roger or Bradley to do so. Rather, the record indicates that Roger had already intended to seek an alternative

pharmacy services provider prior to his discussions with defendants, and that Bradley was not involved in the termination decisions.[2]

Roger testified regarding plaintiff's deficient performance at the Saint Facilities stating, "We did get complaints all the time, a hundred percent . . . .Medications not there, prior authorizations not being done, consultants not showing up, you know, OTC charges that were too high. I mean, lots of issues." Roger further contended that discussions regarding the termination of plaintiff's pharmacy service agreements were initiated in January 2017, and "it was a very cordial meeting." Roger explained that the termination was because the entity plaintiff was planning on selling its enterprise to was "not a good fit," and he desired conducting "business with somebody local, with a small provider . . . ." Roger additionally recalled, "I believed we talked about service issues . . .with the fees, the billing, the consulting, everything else. There were those issues that were going on that hadn't been resolved." Roger also acknowledged that prior to the January 2017 meeting with plaintiff, he contacted other pharmacy services providers to determine whether they may serve potential replacements for plaintiff at the Saint Facilities. When asked whether he recalled "having discussions with OneCare saying that in exchange for their investment, they wanted these Saints contracts," Roger responded, "No, that never happened. That never happened." Roger further replied negatively when asked whether he felt pressured by defendants to terminate plaintiff's pharmacy service agreements. Roger testified that he never promised plaintiff that it would be employed as the pharmacy services provider for the renovated Mission Point facility.

Plaintiff further failed to present any evidence that defendants acted intentionally, with maliciousness, or that they committed a "per se wrongful act." Even if plaintiff could show some "intentional inducement" resulting in the breach of the Saint Facilities pharmacy service agreements, for plaintiff to succeed on the claim, it had to show "improper conduct" as defined above. *Id*. at 282. "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *BPS Clinical Labs v Blue Cross & Blue Shield (On Remand)*, 217 Mich App 687, 699; 552 NW2d 919 (1996). Generally, it "does not constitute improper interference with a contract if a defendant simply takes the initiative to gain an advantage over the competition." *Knight Enterprises*, 299 Mich App at 282 (quotation marks and citation omitted).

In the present case, plaintiff contends that defendants' business "solicitation" of the Saint Facilities was improper because defendants were aware that plaintiff and the Saint Facilities were under contract at the time. Although Pierre testified that he "solicited" Roger by inquiring whether

---

[2] We note while Bradley testified that he believed Roger was "under pressure" regarding defendants' loan and the pharmacy service agreements, Bradley simultaneously asserted that he would not know whether defendants were pressuring Roger. Bradley did not believe there were issues with plaintiff's performance before the termination of its Saint Facilities contracts, and he believed that Roger sought termination of the subject agreements because Roger "owed [plaintiff] a lot of money. Roger had told me that he was going to get money from OneCare to finish up— one was his project for Mission Point Detroit."

there was an opportunity to provide pharmacy services at the Saint Facilities and acknowledged that there were "things to finish with the other pharmacy," Pierre was not aware that any termination of the pharmacy services agreement was improper. Pierre further asserted, "You would think that when somebody give[s] you the pharmacy business, it's automatically [sic] that they don't have [an] obligation to the other pharmacy . . . . Because . . .that's how the normal standard business [sic]. You have to be able to get out of your contract to give the business to somebody else."

Plaintiff further asserts that various e-mail exchanges between defendants and Saint Facilities personnel indicated that defendants exerted pressure on those facilities and influenced the terms of plaintiff's termination letter, as part of a quid pro quo in connection with defendants' investment in Mission Point. However, the cited e-mail exchanges reflect efforts to facilitate the transition from plaintiff to defendants with respect to the provision of pharmacy services at the Saint Facilities. Further, the reference to the termination letter was made to ensure that defendants could timely initiate services by the agreed-upon start date of Mach 1, 2017. Additionally, even if defendants provided the loan to secure their position as the pharmacy service providers for the Saint Facilities, such conduct does not establish that defendant acted with knowledge or intent to induce plaintiff to breach its contractual obligations, nor does it suggest that they were cognizant that the transition was improper beyond the financial aspects of ending services with plaintiff. Rather, this conduct appears to fall within the scope of permissible business competition recognized by applicable caselaw. See *Knight Enterprises*, 299 Mich App at 282; see also *BPS Clinical Labs*, 217 Mich App at 699. Notably, plaintiff acknowledges that it was presented with the same investment opportunity but declined to pursue it.

Plaintiff also avers that defendants' receipt of the cease-and-desist letter before defendants were set to provide services to the Saint Facilities on March 1, 2017, demonstrated that defendants had knowledge that their conduct constituted tortious interference. However, the record reflects defendants received the letter on February 27, 2017—only a few days before the agreed-upon start date—and Pierre explained:

> [Plaintiff's Counsel], we have a signed contract by that time. So I—we're moving forward, that's—that's where I focus on. I have a signed contract with the facility, it's a duty and obligation for me to now go ahead and service. I cannot interrupt patient care, it's too late.

> \* \* \*

> [Plaintiff's Counsel], I didn't have any reason to be believe this. I don't want to get involved between him and Roger. Again I have a signed contract, owner of facility telling me the business—the pharmacy business is available to you. I went ahead and did what I have to do from my side. My contract is not with [plaintiff], my contract is with Roger.

Additionally, plaintiff does not dispute that discussions regarding termination began as early as January 2017, during which the parties negotiated a wind-down of plaintiff's involvement with the Saint Facilities. An e-mail from Roger to Raj Patel, plaintiff's principal, dated January 31, 2017, stating that plaintiff and the Saint Facilities "will be mutually terminating our pharmacy services

and consulting agreements. We have agreed that the facilities will pay all outstanding amounts due [to] [plaintiff] on or before the termination date, and that we will enter into mutually acceptable termination side letter." The e-mail further stated:

> As discussed at our meeting, I think our only point of disagreement is with respect to the transition date. We are requesting March 1st termination date, which is one month earlier than the suggested April termination date. We know that it is tight, but I am sure we can work through the details. We would like the last cycle fill for [plaintiff] to be on February 1st—lasting until [the] 28th, with the OneCare Pharmacy taking over on March 1st.

Plaintiff then waited until the end of February before contacting defendants regarding their purportedly improper conduct. In sum, plaintiff failed to present sufficient evidence that defendants engaged in any misconduct, let alone malicious or wrongful conduct, to induce the subject breach or termination of plaintiff's business relationship or expectancy. Accordingly, the trial court properly granted summary disposition of plaintiff's tortious inference claims.

Affirmed.

/s/ Mariam S. Bazzi
/s/ Mark T. Boonstra
/s/ Brock A. Swartzle