*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RONNIE WELBORN,

Plaintiff-Appellee,

and

MARY WELBORN,

Plaintiff,

v

DR. AKASH R. SHETH, M.D.,

Defendant-Appellant,

and

SURGICAL SPECIALISTS OF MICHIGAN, P.C.
and WILLIAM BEAUMONT HOSPITAL a/k/a
WILLIAM BEAUMONT-GROSSE POINTE,

Defendants.

UNPUBLISHED
August 13, 2019

No. 342650
Wayne Circuit Court
LC No. 16-009274-NH

Before: K. F. KELLY, P.J., and TUKEL and REDFORD, JJ.

PER CURIAM.

Defendant, Dr. Akash R. Sheth, M.D., appeals by leave granted[1] the trial court order granting in part and denying in part his motion for summary disposition in this medical

---

[1] *Welborn v Dr Akash R Sheth MD*, unpublished order of the Court of Appeals, entered June 18, 2018 (Docket No. 342650).

malpractice action. We reverse and remand for entry of an order granting summary disposition in favor of defendant with regard to the claim of damages for prolonged dialysis.

## I. BASIC FACTS AND PROCEDURAL HISTORY

On January 25, 2014, plaintiff presented at William Beaumont Hospital[2] with complaints of nausea, vomiting, diarrhea, difficulty urinating, and a distended abdomen. Tests were performed, and an evaluation indicated that plaintiff suffered from systemic inflammatory response syndrome (SIRS), small bowel obstruction, and a ruptured appendix. Plaintiff alleged that defendant, a surgeon, was consulted regarding his condition, but did not conduct a personal review of his symptoms. Additionally, defendant did not meet with plaintiff until 11:00 a.m. on January 26, 2014. Ultimately, plaintiff alleged that surgery was not performed until 18 hours after his admission to the hospital. It was asserted that defendant committed medical malpractice by failing to perform surgery within six to eight hours of the final diagnosis to prevent complications, septic shock, and a continued need for dialysis.

Following discovery, defendant moved for summary disposition pursuant to MCR 2.116(C)(10). Defendant alleged that the medical malpractice action failed as a matter of law because plaintiff did not present expert testimony to support his theory that defendant caused plaintiff to suffer from SIRS, permanent dialysis, and prolonged dialysis. Although plaintiff claimed those three injuries as a result of defendant's treatment, he presented two general surgery experts, Dr. Elliott Goodman and Dr. Melanie Friedlander, and neither expert linked the damage to treatment by defendant. Defendant submitted that plaintiff's experts did not opine that a breach of the standard of care by defendant caused plaintiff to develop SIRS. With regard to the injuries for permanent and prolonged dialysis, both experts deferred to a nephrology expert, but plaintiff had not retained such an expert. Rather, the only nephrology expert, Dr. Jerry Yee, was retained by defendant, and Dr. Yee opined that the injuries that caused the need for dialysis were sustained before plaintiff arrived at the emergency room for treatment.

Plaintiff opposed the motion for summary disposition, alleging that defendant discussed his case with hospital personnel, but failed to come to the hospital to conduct an independent examination. Additionally, defendant did not appear at the hospital until 11:00 a.m. on January 26, 2014, and this delay between admission and surgery caused him to develop acute renal failure, a need for dialysis, and the progression of his sepsis. Plaintiff alleged that his experts opined that the delay between admission and surgery exacerbated the damage to his kidneys. Alternatively, plaintiff requested the opportunity to amend the complaint to include allegations regarding the elevation of SIRS to sepsis if the court concluded that summary disposition was appropriate.

---

[2] The parties stipulated to dismiss plaintiff, Mary Welborn, and defendants, Surgical Specialist of Michigan, P.C. and William Beaumont Hospital a/k/a William Beaumont – Grosse Pointe. Accordingly, the singular plaintiff refers to Ronnie Welborn only, and the singular term defendant refers to Dr. Akash R. Sheth, M.D.

-2-

At the hearing on the dispositive motion, the defense reiterated its position that plaintiff's experts deferred to a nephrology expert regarding whether the permanent and prolonged dialysis was necessitated by defendant's delay in treatment. However, plaintiff's counsel opined that a nephrology expert was unnecessary because his experts testified that prolonged delay caused systemic failure. Upon questioning by the court, plaintiff's counsel acknowledged that he had no testimony to support the "question of permanency as it relates to the need for the dialysis." However, he would not make any concession with regard to the claim that defendant caused the need for prolonged dialysis. Defense counsel noted that plaintiff failed to cite deposition testimony to support a claim of prolonged dialysis, and a prolonged need for dialysis was subsumed within a claim for permanent dialysis. Additionally, the defense asserted that even plaintiff's experts acknowledged that plaintiff had experienced SIRS that led to full blown shock when he arrived at the hospital because plaintiff suffered from the condition for four days before he arrived at the hospital. Plaintiff's counsel asserted that his expert, Dr. Goodman, opined that the longer the wait, the more damage there was to the kidneys, and he was pursuing amendment to address the SIRS issue. After the court noted that there did not appear to be a genuine issue on the SIRS claim, plaintiff's counsel "accepted" the court's conclusion. Ultimately, the court granted summary disposition of plaintiff's claims for damages premised on SIRS and permanent dialysis, but allowed plaintiff to submit the claim for prolonged dialysis to a jury. Plaintiff moved for reconsideration and attached an affidavit from Dr. Friedlander to support plaintiff's contention that he suffered from SIRS that progressed to sepsis as a result of defendant's malpractice, but the trial court denied the motion for reconsideration, holding that it presented the same issues previously ruled on by the court.

## II. EXPERT TESTIMONY

Plaintiff offered two experts to support his medical malpractice action. Dr. Elliott Goodman, a board-certified general surgeon, testified that plaintiff had a four-day history of abdominal pain, nausea, vomiting, and diarrhea. Because his condition had occurred for several days, the appendix acted like a "bomb" that had exploded, and there was pus everywhere. Plaintiff may not have been in septic shock when he arrived at the hospital, but he progressed to the condition within a matter of hours. Dr. Goodman testified that if a patient arrived in sepsis or sepsis shock, a doctor must control the source within 6 to 12 hours of the sepsis diagnosis and use fluid resuscitation and antibiotics. It was alleged that defendant should not have relied on the hospital's resident opinion and should not have waited 18 hours after admission to examine plaintiff in light of the symptoms and vitals. Rather, he should have conducted an evaluation of the abdomen to determine the need for immediate surgery. With regard to his opinion regarding injury and damage, Dr. Goodman testified:

> I think the failure to take the patient to the operating room on a timely basis within, let's say, six to eight hours after the diagnosis was made, meaning to take him to surgery no later than around 3:00 or 4:00 o'clock in the morning of the 26th caused a delay of around, let's say, 12 hours or so.
>
> And I think that that 12-hour delay was a proximate cause to a lot of the septic consequences of the sepsis and the peritonitis and the ruptured appendix and that that delay, for instance, meant that the patient developed intractable or

irreversible acute kidney injury on top of whatever kidney insufficiency he had such that he is now dialysis dependent.

And I think to a reasonable degree of medical certainty that had the patient been taken to the operating room those 12 hours earlier, then the septic course would have been truncated, would have been arrested.

So that his acute kidney injury would have lessened to the point that he may have required dialysis for a short period of time. But I don't think he would have ended up requiring permanent dialysis.

I also think, for instance, he would not have been on the ventilator for so long because, again, his acute respiratory failure was a consequence of the sepsis and the septic shock, et cetera, and that he may not, for instance, or he would to reasonable degree of medical certainty, would not have ended up needing a trach on, I believe the whatever it was, the 12th of February – I'm sorry the 21st of February.

So his septic course would have been much shorter, much less severe without the need for the trach and without the need for permanent dialysis had he been resuscitated and the source of sepsis controlled on a timely basis.

Dr. Goodman had reviewed 8 to 9 percent of the 11,000 page medical record to formulate his standard of care opinion regarding the first 20 hours of plaintiff's care, and his opinion regarding the standard of care would not be augmented by additional information. However, he asked to see the nephrology records to formulate complete causation opinions because plaintiff had some degree of kidney disease before he arrived at the hospital. Therefore, to address the causal link between the sepsis and now dependence on dialysis, he needed to see the nephrology outpatient records to determine the condition of the kidneys before plaintiff became septic. Dr. Goodman agreed that defendant performed the appropriate procedure in a successful manner, but took issue with the timing of the procedure. When questioned about the degree of acute kidney injury, any reversibility, and acute renal failure upon hospital admission, Dr. Goodman acknowledged that he did not know plaintiff's baseline kidney function because he did not have those medical records. Dr. Goodman also acknowledged that the medical records indicated that plaintiff's wife initially refused to provide consent for surgery at 12:20 p.m. on January 26, 2014. However, he opined that this 1 to 2 hour delay was a small or minor contribution to the septic complications from not being taken to surgery 12 hours earlier. However, when asked to conclude whether the 12-hour delay in surgery rendered the acute renal failure irreversible, Dr. Goodman answered, "I don't think I can say." He then agreed that a nephrologist was in a better position to address functioning of the kidneys and acute renal failure and would defer to a nephrologist under those circumstances.

Dr. Melanie H. Friedlander, a board-certified general surgeon, reviewed plaintiff's medical file and opined that he arrived at the hospital with a ruptured appendix. Dr. Friedlander reviewed the opinion by Dr. Goodman and was in agreement with it. She also opined that if a surgeon consulted on a patient with an acute small bowel obstruction and signs of sepsis, the patient should be seen at the time of consultation and not the next day. Dr. Friedlander testified

that she reviewed the medical records and defendant's deposition to conclude that plaintiff should have been operated on the day he presented to the emergency room. She did not criticize the type of surgery or its success, but opined that it should have been performed sooner. She could not determine if plaintiff's appendix ruptured three to four days before the surgery, but acknowledged that it was perforated at least one day before he arrived at the emergency room. Dr. Friedlander also concluded that defendant did not breach any standard of care following the surgery. She opined that he breached the standard of care: (1) by not seeing plaintiff on the day of the consult because it was known from the x-ray that there was an acute small bowel obstruction even before the CAT scan results arrived; (2) he should have seen plaintiff first thing the next morning, not at 11:00 a.m.; and (3) once the family agreed to the surgery, the surgery should have occurred in a timely fashion even if the surgery schedule had to be altered. Dr. Friedlander opined that "there's a reasonable degree of medical probability that the patient's outcome was worse" as a result of the breaches.

Dr. Friedlander was unsure if plaintiff arrived at the hospital with sepsis, but acknowledged that minimally he had SIRS, a condition where the patient demonstrates characteristics of sepsis, but does not meet the criteria for sepsis. A patient's condition proceeded from SIRS into sepsis with a showing of hypertension, tachycardia, and a known source of infection. After examining plaintiff's chart, Dr. Friedlander concluded that plaintiff was in septic shock before defendant consulted on the case. According to his deposition, defendant indicated that the surgery's timing was influenced by plaintiff's daughter because she did not believe that he was medically stable for the surgery. Dr. Friedlander opined that a doctor should not take medical advice from a patient's family member and should not rely on the physical examination by another hospital staff member. Because of the septic shock, Dr. Friedlander concluded that defendant should have been at plaintiff's bedside within 1 to 2 hours because early intervention could mean the difference between life and death.

When questioned regarding injuries resulting from the breaches of the standard of care, Dr. Friedlander testified:

> Well, its' difficult to know what his outcome would have been if he had had surgery on the night of admission. Nobody has a crystal ball to predict that. But there is a reasonable degree of medical probability that all of his multiple organ failure issues would have been less severe had he gone to surgery sooner because the underlining cause of sepsis would have been sooner and the fallout would have been less.
>
> So it's difficult to say how much better things would have been. It's possible that his kidney function would have improved sooner. It's possible that he wouldn't have needed long-term dialysis. I mean, when kidneys fail for sepsis, the kidney function usually returns and improves. And granted, [plaintiff] was already starting with some degree of renal dysfunction. But even with that, if it had been - - if his underlying cause of sepsis had been treated sooner, his multiple organ failure probably would not have been as severe. He may not have developed ARDS. His entire hospital course could have been shorter, simpler, less complication.

-5-

However, Dr. Friedlander then stated that plaintiff did not suffer kidney failure because of defendant's breach of the standard of care, but rather, because of the sepsis. She acknowledged that plaintiff arrived at the emergency room with acute kidney failure before defendant was asked to consult on his care. Dr. Friedlander was asked to quantify how much worse plaintiff's kidney function was as a result of the breaches of the standard of care, she answered, "I cannot." She did not know how much better plaintiff would have been if defendant went to the hospital on the night of the consult "or if it could have been better at all." Dr. Friedlander acknowledged that she did not manage chronic kidney failure patients and their need for permanent dialysis and would defer to a nephrologist on those issues.

Plaintiff also submitted testimony from Dr. James McQuiston.[3] Dr. McQuiston, a general surgeon, offered a meritorious defense, asserting that plaintiff represented that he believed he had food poisoning and obtained relief of his discomfort following digestion of over the counter medication. However, the x-ray showed a small bowel obstruction, and the scan taken later that day revealed a ruptured appendix. Because he was ill and needed to be resuscitated, plaintiff was cared for in the intensive care unit. Dr. McQuiston opined that there was no breach of the standard of care because there were plenty of physicians caring for plaintiff and attempting to stabilize his condition and avoid surgery. He testified that a recent study of 32,000 case records demonstrated that there was no difference in final outcomes between an early and delayed surgery. Dr. McQuiston opined that plaintiff was in septic shock when he arrived at the hospital, and he suffered a perforation 1 to 2 days earlier. He testified that plaintiff would not have been operated upon sooner because he was not stable enough for the surgery. Plaintiff was in renal failure when he arrived at the hospital, and his kidneys shut down and never responded because of the sepsis. He concluded it was reasonable to wait 12 to 24 hours to determine if the patient would show signs of improvement.

Finally, Dr. Jerry Yee, a senior staff nephrologist affiliated with Henry Ford Hospital, reviewed plaintiff's medical condition and treatment before the alleged January 2014 medical malpractice by defendant. Plaintiff's medical history revealed chronic kidney disease. When plaintiff arrived at the hospital, he was in acute kidney failure and septic shock. The kidney failure was caused by an infection, septic shock, low blood pressure, and the prior kidney disease. The initial course of action was to treat plaintiff's low blood pressure and repair the infection. Counsel asked Dr. Yee, with regard to plaintiff's condition, "[T]he longer the delay in performing surgery, the more risk there is for damage to the kidneys?" Dr. Yee responded:

> No, not necessarily. Kidney failure after it's established, actually it's protective; there are cytoprotective measures. So, this was observed as early as the seventies that if you have an insult to the kidney, like a turtle will cover itself up and won't be injured again, the kidneys already in this case have been hammered, so to speak, and it's not really going to get any worse. Kidney failure was clearly established, because even after they gave fluids which would normally dilute the serum creatinine, the creatinine continued to increase, so

---

[3] Plaintiff submitted this deposition with his answer to the dispositive motion.

nothing that I could have done or anyone else could have done would have made the kidney better at that point. The kidney heals on its own. There's no medication for the kidney. The dye [sic] was cast.

In fact, he actually gave an excellent history, the patient, by saying, "I'm having trouble urinating," but he already had a history of benign prostatic hypertrophy which probably injures his kidneys, which is why it was so silent, and also had a history of a urinary tract infection several years before, which showed that he already had problems with his urogenital plumbing, so to speak, which fostered him to have kidney problems, but he already had established kidney failure.

It wasn't going to matter what I did or anybody else, for that matter, so treating infection was to treat the infection, not to save the kidneys. Had nothing to do—one had nothing to do with each [sic] other. The most judicious problem or thought was picking the right antibiotics; that's all at that point. They gave him the fluids . . . [T]here's nothing to do for the kidneys at this point.

Dr. Yee further stated that plaintiff had stage III acute kidney failure and that had he gotten to the hospital earlier, it would have made little difference; he just would not have suffered as much. "They could have dialyzed him, they could have done things, but it wouldn't have mattered."

## III. SUMMARY DISPOSITION STANDARD

A trial court's ruling on a motion for summary disposition is de novo. *Bennett v Russell*, 322 Mich App 638, 642; 913 NW2d 364 (2018). Summary disposition is appropriate pursuant to MCR 2.116(C)(10) where there is "no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). When reviewing a motion for summary disposition challenged under MCR 2.116(C)(10), the court considers the affidavits, pleadings, depositions, admissions, and other admissible documentary evidence then filed in the action or submitted by the parties. MCR 2.116(G)(4), (G)(5); *Puetz v Spectrum Health Hosps*, 324 Mich App 51, 68; 919 NW2d 439 (2018).

The moving party has the initial burden to support its claim for summary disposition with affidavits, depositions, admissions, or other documentary evidence. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). The burden then shifts to the nonmoving party to establish that a genuine issue of disputed fact exists for trial. *McCoig Materials, LLC v Galui Constr, Inc*, 295 Mich App 684, 693; 818 NW2d 410 (2012). The nonmoving party may not rely on allegations or denials in the pleadings, but must present admissible documentary evidence. *Id*.

## IV. APPLICATION OF THE LAW TO THE FACTS

We conclude that the trial court erred in denying defendant's motion for summary disposition pertaining to the claim of prolonged dialysis.

To prevail on a claim for medical malpractice, a plaintiff must prove four requirements: "(1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care." *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). For medical malpractice, the plaintiff has the burden of proving that he suffered an injury that more probably than not was proximately caused by the negligence of the defendant. MCL 600.2912a(2). In *Robins v Garg (On Remand)*, 276 Mich App 351, 362; 741 NW2d 49 (2007), this Court explained the principles of causation in the context of medical malpractice actions:

> 'Proximate cause' is a term of art that encompasses both cause in fact and legal cause. Generally, an act or omission is a cause in fact of an injury only if the injury could not have occurred without (or 'but for') that act or omission. Cause in fact may be established by circumstantial evidence, but the circumstantial evidence must not be speculative and must support a reasonable inference of causation. All that is necessary is that the proof amount to a reasonable likelihood of probability rather than a possibility. The evidence need not negate all other possible causes, but such evidence must exclude other reasonable hypotheses with a fair amount of certainty. Summary disposition is not appropriate when the plaintiff offers evidence that shows that it is more likely than not that, but for defendant's conduct, a different result would have obtained.

Thus, "a causal connection between a defendant's breach of the applicable standard of care and a plaintiff's injuries is critical." *Rock v Crocker*, 499 Mich 247, 255; 884 NW2d 227 (2016). Generally, expert testimony is necessary in a malpractice action to establish the applicable standard of care and to demonstrate that the medical professional breached the standard. *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016).

Because the deposition testimony offered by plaintiff failed to demonstrate a causal link between defendant's actions and plaintiff's prolonged dialysis, summary disposition was appropriate in favor of defendant.

A review of the deposition testimony from plaintiff's experts, Dr. Goodman and Dr. Friedlander, reveals that both doctors claimed that the delay in treatment between plaintiff's admission and defendant's performance of the surgery caused damage to plaintiff. However, when questioned about the degree of kidney injury that plaintiff had when he was admitted to the hospital and whether his kidneys would have recovered or if the injury would have been reversed if surgery was performed sooner, both doctors indicated that they would defer to a nephrologist regarding that determination. Although Dr. Goodman unequivocally concluded that defendant breached the standard of care and additional information would not alter his opinion, Dr. Goodman declined to address the causal link between the sepsis and dialysis dependency. He noted that he did not have the nephrology records to determine any pre-existing kidney conditions. Similarly, Dr. Friedlander was asked to determine how much worse plaintiff's kidney condition was as a result of defendant's breach of the standard of care, and she could not answer the question. Additionally, she could not opine how much better plaintiff's condition would be or if it would be better at all and also deferred to a nephrologist on those issues.

-8-

As defendant notes, the sole nephrologist offered was Dr. Yee. Dr. Yee examined plaintiff's medical records and was aware that he had a prior history of chronic kidney disease. Dr. Yee opined that the prior history coupled with the symptoms that plaintiff presented at the hospital demonstrated that there were no other measures to reverse the damage done to the kidneys. Accordingly, plaintiff failed to meet his burden of demonstrating that he required prolonged dialysis as a result of defendant's breach of the standard of care, and the court erred in denying summary disposition of this injury claim.[4]

Accordingly, we reverse the trial court's denial of the motion for summary disposition pertaining to the claim of prolonged dialysis and remand for entry of an order granting summary disposition of this claim. We do not retain jurisdiction.

/s/ Kirsten Frank Kelly
/s/ Jonathan Tukel
/s/ James Robert Redford

---

[4] In light of our holding that plaintiff failed to present expert testimony to support a claim for injury premised on prolonged dialysis, we need not address defendant's additional contention that prolonged dialysis was subsumed within the claim premised on permanent dialysis.