*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SHAWN MCINTOSH,

       Plaintiff,

and

MICHIGAN INSTITUTE OF PAIN AND
HEADACHE, P.C., doing business as METRO
PAIN CLINIC,

       Intervening Plaintiff-Appellant,

v

ENTERPRISE LEASING COMPANY OF
DETROIT,

       Defendant-Appellee.

UNPUBLISHED
February 4, 2020

No. 344607
Wayne Circuit Court
LC No. 17-000095-NF

SHAWN MCINTOSH,

       Plaintiff-Appellant,

and

MICHIGAN INSTITUTE OF PAIN AND
HEADACHE, P.C., doing business as METRO
PAIN CLINIC,

       Intervening Plaintiff,

v

ENTERPRISE LEASING COMPANY OF
DETROIT,

       Defendant-Appellee.

No. 344833
Wayne Circuit Court
LC No. 17-000095-NF

-1-

GENIE THERAPY, LLC,

      Plaintiff,

and

SHAWN MCINTOSH,

      Intervening Plaintiff-Appellant,

v

ENTERPRISE LEASING COMPANY OF
DETROIT,

      Defendant-Appellee.

No. 344882
Wayne Circuit Court
LC No. 16-017213-NF

Before:  K. F. KELLY, P.J., and BORRELLO and SERVITTO, JJ.

PER CURIAM.

In Docket No. 344607 and in Docket No. 344833, the Michigan Institute of Pain and Headache, P.C. (MIPH) (intervening plaintiff) and Shawn McIntosh (plaintiff) respectively, appeal as of right the May 10, 2018 order dismissing McIntosh's case and MIPH's claims against Enterprise Leasing Company of Detroit (Enterprise Leasing) pursuant to MCR 2.116(C)(10).  In Docket No. 344882, McIntosh (intervening plaintiff) appeals as of right the same order, and its holding with respect to a separate lawsuit brought by Genie Therapy, LLC (Genie Therapy); the two cases had been consolidated in the lower court.  The trial court's order was based on a finding of no genuine issue of material fact that McIntosh made fraudulent representations in seeking no-fault personal protection insurance (PIP) benefits.  This Court consolidated the appeals.  *Shawn McIntosh v Enterprise Leasing Co of Detroit*, unpublished order of the Court of Appeals, entered August 8, 2018 (Docket Nos. 344607, 344833 and 344882).  We now affirm.

On January 2, 2016, McIntosh was a backseat passenger in a Nissan Versa rented to his half-sister, Shawntia Brown, by Enterprise Leasing.  Brown was driving and was pulling into or stopped in her driveway when the Versa was struck by an unknown vehicle which then fled.  The Traffic Crash Report indicated that McIntosh was injured and taken by ambulance to Sinai Grace Hospital, that the Versa's airbags did not deploy, and that there was minor damage to the car.  A photograph indicated that there was minor damage to the rear bumper.

McIntosh claimed that the unknown car ran a stop sign and was coming toward them "fast." He claimed that the impact on "the back door of the left side, the driver's side on [his] side" was so hard that "our car [spun]."  He claimed that he believed he hit his head on the window and lost consciousness "for a minute."  McIntosh alleged that he was dizzy and stayed in the hospital overnight.  He claimed that his left leg, left arm, neck, and back were injured.  Thereafter, he was

-2-

given shots for pain in his back, Genie Therapy provided physical therapy, and he was treated at MIPH.

McIntosh claimed the following: that he was bedridden for about "four weeks" following the incident; that he could not lift a "gallon of milk;" and that he needed assistance with grooming, bathing, and feeding. He said that his cousin, Reneka Prince, assisted him after the collision, providing him transportation and helping him "almost 24 hours a day." Eventually, he moved in with his fiancée, and he claimed that she began taking care of him because he still needed "help getting down the stairs and sometimes getting up out the bed and [help] getting up out cars and walking." McIntosh allegedly told Prince and his fiancée that he would pay them for their services if he received any money.

Brown, who was McIntosh's half-sister, testified at deposition that the unknown car "was not going that fast" because, if it was, "it would have hit the car way harder than it did." She did not see the other car coming before the impact, and did not see it speeding or running a stop sign. According to Brown, the other car "jumped on the curb, hit the bumper and continued to go," taking off "immediately." Brown denied that the impact caused the car to spin in any way; she stated that it did not move upon impact. Further, Brown denied that there was any damage to the rear left door area where McIntosh was sitting, noting that the impact was only to the left rear bumper. Brown stated that McIntosh never lost consciousness. She testified that he was "making it up" with regard to his injuries when the ambulance arrived on the scene:

> How do I know? Because no one else was hurt. The bumper was hanging off, and his was sitting out the car. The minute he knew the ambulance and the police were going to come he got back and now all of a sudden he's sitting like this. He was not just doing that.

> * * *

> When the ambulance lights and police came coming around that corner, you can see them before they basically really get there, he turned back in the car and then went from being normal to looking like he just literally got himself hit by the car. He just went into like a -- What's up with you? It didn't make any sense.

According to Brown, the "accident" was staged by McIntosh and his cousin, Eric White, because they had been known to "run those kind of schemes." She stated:

> Now, [McIntosh] is sitting there and I immediately turn to [White] and I say [White], that's F'ed up that you did that, because they run those kind of schemes. They look for car accidents. They look for car accidents and I guess it's like the 1-800-411-Pain, because in New Jersey we don't have that, so I know about that up here from them; so I know they like to do those kinds of things.

> And I'm cursing [White] out because [White] spends a little time with me and my sister . . . , we are kind of cool. I said that's messed up, this is a rental car, my kids. Why would you do that to me. You didn't say anything, and not that I would have been with it, but you just did something to me for no reason.

-3-

[White] is very apologetic and [McIntosh] is sitting there, oh, so hurt, which doesn't make any sense how you got that hurt when there is no bodily damage to the car. It's to the bumper. And if you were hurt why wouldn't the four-year old [who had also been in the backseat] be hurt and also why wouldn't [White, who was also in the back seat]? The car is a compact car.

Brown asserted that after the collision McIntosh carried on with his "normal life," and only wore a neck brace in public. She testified that she lived with him before the accident and continued to live with him for about one month afterward. She reported that during that time McIntosh never received any attendant care or household services from Prince or anyone else.

Brown continued to drive the Versa and did not report the damage to Enterprise Leasing, believing McIntosh was going to help pay to get it fixed without Enterprise Leasing finding out. Brown took the Versa to Enterprise Leasing's office once per month for an inspection in order to renew the rental agreement. After the car was damaged, an employee there named Tina (with whom Brown had developed a rapport) would simply look out a window to "inspect" the car, and only the front and sides of the car were visible from the window. Tina renewed the rental agreement in this manner for several months. Tina eventually learned from "corporate" that the car had been in an accident and damaged, and she asked Brown to bring it in, in April 2016.

On December 6, 2016, McIntosh submitted an application for personal protection insurance (PIP) benefits to Elco Insurance, which handles insurance claims for Enterprise Leasing. He included forms detailing attendant care services allegedly provided by Prince for approximately 4½ months for "Grooming, Toileting, Assistance w/Meds & Dressing Changes, Transfers, and Supervision." He also submitted forms for six months of replacement household services allegedly provided by Prince, including cleaning, mopping, meal preparation, sweeping and vacuuming, making the bed, washing dishes, laundry, ironing, and taking out the garbage.

Amanda Szyszka, the claims adjuster for Elco, questioned whether the accident occurred. She testified at deposition:

The vehicle had a contract rewritten multiple times after the question of the accident. [The Enterprise Leasing] branch saw the car with no damage; the car did not go back to [Enterprise Leasing] until April, and that's when it was noted that it was hit while parked.

During her investigation, Szyszka commissioned an independent medical examination of McIntosh. The doctor determined that his "cervical and lumbar strain/pain" had resolved, that there were "no objective findings" with respect to leg pain, that the treatment received was "excessive," and that "six to eight weeks" of treatment would have been "reasonable." Ultimately, Elco did not pay any benefits on McIntosh's behalf.

After McIntosh and his providers filed suit and the cases were consolidated, Enterprise Leasing moved to dismiss pursuant to MCR 2.116(C)(10), asserting that the claims were all barred because of fraud by McIntosh and others related to the alleged accident and the claims for PIP benefits. In response, McIntosh attested that he "did not conspire with anyone to stage this accident." The trial court granted defendant's motion, finding no genuine issue of material fact

with respect to the fact that there was fraud in this case. MIPH and McIntosh now appeal as of right.

McIntosh and MIPH argue that the trial court erred in granting summary disposition to defendant pursuant to MCR 2.116(C)(10). We disagree.

Summary disposition rulings are reviewed de novo. *Beaudrie v Henderson,* 465 Mich 124, 129; 631 NW2d 308 (2001). In reviewing a motion for summary disposition under MCR 2.116(C)(10), a court considers "affidavits, pleadings, depositions, admissions, and other documentary evidence submitted by the parties in the light most favorable to the party opposing the motion." *Greene v AP Prods, Ltd*, 475 Mich 502, 507; 717 NW2d 855 (2006). "Summary disposition under MCR 2.116(C)(10) is appropriately granted if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Id.*, quoting *Rose v Nat'l Auction Group*, 466 Mich 453, 461; 646 NW2d 455 (2002). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v GMC*, 469 Mich 177, 183; 665 NW2d 468 (2003). A court may not make factual findings on disputed factual issues, nor make credibility determinations during a motion for summary disposition. *Puetz v Spectrum Health Hosps*, 324 Mich App 51, 68-69; 919 NW2d 439 (2018). If the evidence before the court is conflicting, summary disposition is improper. *Patrick v Turkelson*, 322 Mich App 595, 605-606; 913 NW2d 369 (2018).

McIntosh and MIPH argue that the trial court improperly assessed credibility and weighed evidence in favor of Enterprise Leasing on material issues of whether the collision was an accident or intentional, and whether Brown's or McIntosh's version of the events was the correct one. They also argue that there is conflicting testimony regarding material issues, that McIntosh's claim is not "wholly lacking" in evidence, and that a jury was therefore entitled to make those determinations. McIntosh and MIPH rely, in part, on *White v Taylor Distrib Co*, 275 Mich App 615; 739 NW2d 132 (2007), to support their positions.

In *White*, the defendant truck driver struck the plaintiff's car from behind. *Id*. at 616. The defendant asserted that he had blacked out, secondary to a medical problem that he thought was under control, and therefore was not negligent due to the application of the "sudden emergency" doctrine. The trial court granted summary disposition in his favor. This Court reversed, holding in part:

> Here, defendants' attempt to rebut the statutory presumption [of negligence], on which they had the burden of proof, relied on the credibility of [the driver] with respect to his deposition testimony that he blacked out before the accident while on the exit ramp and that he was not feeling ill when he left the rest area. These are matters that are subjective in character and primarily within the exclusive knowledge of [the driver]. It is self-evident that [the driver] would have the motivation to give a version of events that would be favorable to him and that would distance him, and thereby all the defendants, from liability. A jury should be permitted to assess his credibility while on the witness stand. Summary disposition is simply *not appropriate* under these circumstances. [*Id*. at 630, italics in original].

The difference between the instant case and *White* is that the alleged misrepresentations in *White* were "primarily within [the truck driver's] exclusive knowledge." *Id.*, at 616, 629-630. In the present case, on the other hand, there was an eyewitness, Brown. Brown rented the car, she drove the car, her young kids were in the car, and she was there when the collision occurred; and she also lived with McIntosh for a month afterward and was able to witness his post-accident condition. Whereas the defendant truck driver in *White* was the only one with knowledge of the alleged fraud, here, Brown had knowledge establishing the fact of McIntosh's misrepresentations. Based on Brown's observations and more, reasonable minds could not differ as to whether McIntosh made fraudulent representations in regard to his claims for PIP benefits.

Section 4503 of the Insurance Code defines "fraudulent insurance acts," in pertinent part, as follows:

> A fraudulent insurance act includes, but is not limited to, acts or omissions committed by any person who knowingly, and with an intent to injure, defraud, or deceive:
>
> * * *
>
> (c) Presents or causes to be presented to or by any insurer, any oral or written statement including computer-generated information as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains false information concerning any fact or thing material to the claim.
>
> (d) Assists, abets, solicits, or conspires with another to prepare or make any oral or written statement including computer-generated documents that is intended to be presented to or by any insurer in connection with, or in support of, any claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false information concerning any fact or thing material to the claim.
>
> * * *
>
> (i) Knowingly and willfully assists, conspires with, or urges any person to fraudulently violate [MCL 500.4501 et seq.], or any person who due to that assistance, conspiracy, or urging knowingly and willfully benefits from the proceeds derived from the fraud [MCL 500.4503].

The evidence presented in the present case reveals that McIntosh made fraudulent material representations as to 1) the "accidental" nature of the collision, 2) the extent and nature of his alleged injuries, and 3) the replacement and attendant care services allegedly provided by Prince. Brown, McIntosh's half-sister, rented the car, was the driver of the car, and was there at the moment of the collision. She testified emphatically as to the "staged" nature of the collision; and her unrefuted testimony was that White was "very apologetic" to her on the scene when she angrily confronted him and McIntosh about staging the collision with her young children in the car. Neither White nor McIntosh denied Brown's accusations of staging the accident until

-6-

Enterprise Leasing moved for summary disposition, at which point McIntosh produced a self-serving affidavit stating that he did not stage the collision. Brown asserted that she was well aware that McIntosh and White would run these "kind of schemes," looking for "accidents." And, Brown testified that immediately after the accident, McIntosh appeared fine and had his legs out of the car, and only when the ambulance and police showed up did he put his legs back in and adopt facial expressions and actions suggesting he was injured. Moreover, the photo taken of the Versa after the collision shows the minimal damage to the Versa's bumper, and no damage to the left side passenger door where McIntosh was sitting, even though he claimed that the unknown car ran a stop sign, was coming toward them "fast," hit them when they were "almost in" the driveway, and that the impact on "the back door of the left side, the driver's side" was so hard that the car spun. Brown testified that she received a bill from Enterprise Leasing for the damaged bumper in the amount of $400.[1] McIntosh's testimony is refuted by the photograph, as well as Brown's testimony, and the absence of injury to any other occupant.

McIntosh claimed that he was "bedridden" for 3 to 4 weeks following the collision, that Prince had to stay with him to assist him for "almost 24 hours a day," and that Prince provided attendant care services approximately 92.3 hours a week from January through April. However, Brown continued to live with McIntosh for one month after the collision, and she asserted that during that time Prince never came to the house and never assisted with anything. Brown testified that McIntosh proceeded with his normal life, never received any attendant care or replacement services at their house, and only wore his neck brace when going outside in public. Additionally, the attendant care services that were documented were in the exact same amounts per task, for each week from January through April, but McIntosh himself testified that he was only "bedridden" for 3 to 4 weeks after the collision, that he moved residences several times, including staying with Prince at her residence for weeks at a time, and also that he improved with physical therapy over time. It is not reasonable to believe that Prince provided the exact same amount of services every week for four months when McIntosh was improving over time. No reasonable jury could conclude that he was so severely injured as to require months of physical therapy, attendant care, and replacement services. Based upon the minor damage to the Versa's bumper as reflected in the photo, the incredible aspects of McIntosh's testimony given this photograph, the testimony of Brown, an eyewitness to the collision and to plaintiff's recovery thereafter, the unreasonable amount of attendant care services documented and submitted by McIntosh, and an IME report, there could be no reasonable belief that the accident occurred as McIntosh claimed or that he suffered injury as claimed, and thus, there was no *genuine* issue of material fact with respect to the fact that McIntosh fraudulently represented the nature and extent of his injuries.

A treatment provider stands in the shoes of the named insured; therefore, the provider cannot recover benefits if the insured is barred from recovery. *Bahri v IDS Prop Cas Ins Co*, 308 Mich App 420, 424-426; 864 NW2d 609 (2014). The evidence in the present case demonstrates that McIntosh made fraudulent representations justifying the trial court's grant of summary

---

[1] The claims adjuster for Enterprise testified that she "believe[d] it was $1400 according to my notes, let me just look at my notes." The subject was then changed. It is thus not clear what the actual cost of the repair was.

disposition as to his own claims, and therefore also as to the claims of his health care providers, Genie Therapy and MIPH.

McIntosh also argues that, in an earlier order, the trial court erroneously applied the "one-year-back rule" set forth in MCL 500.3145, and dismissed all of his claims for services provided by Genie Therapy prior to August 15, 2016. MCL 500.3145 provides in pertinent part:

(1) An action for recovery of personal protection insurance benefits payable under this chapter for an accidental bodily injury may not be commenced later than 1 year after the date of the accident that caused the injury unless written notice of injury as provided in subsection (4) has been given to the insurer within 1 year after the accident or unless the insurer has previously made a payment of personal protection insurance benefits for the injury.

(2) Subject to subsection (3), if the notice has been given or a payment has been made, the action may be commenced at any time within 1 year after the most recent allowable expense, work loss, or survivor's loss has been incurred. However the claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced.

* * *

(4) The notice of injury required by subsection (1) may be given to the insurer or any of its authorized agents by a person claiming to be entitled to benefits for the injury, or by someone in the person's behalf. The notice must give the name and address of the claimant and indicate in ordinary language the name of the person injured and the time, place, and nature of the person's injury.

"The purpose of the one-year limitation is to protect against stale claims and protracted litigation." *Botsford General Hosp v Citizens Ins Co,* 195 Mich App 127, 140-141; 489 NW2d 137 (1992).

Genie Therapy initiated an action against Enterprise Leasing on December 22, 2016 (16-17213-NF). After the trial court granted summary disposition in favor of Enterprise leasing, McIntosh signed an "Assignment of Rights" assigning to Genie Therapy his rights for no-fault benefits for past services provided by Genie Therapy. Genie Therapy then moved to file an amended complaint asserting standing based on this assignment, and it was granted on September 1, 2017. On September 27, 2017, Enterprise Leasing moved for summary disposition pursuant to MCR 2.116(C)(10), based upon an invalid/ineffective transfer of rights between McIntosh and Genie Therapy. On December 8, 2017, the trial court entered an order granting defendant's motion in part:

Defendant's Motion for Summary Disposition is granted as to the application of the "one year back rule" of MCL 500.3145(1) to the bills at issue, barring Plaintiff from recovering for dates of service predating August 15, 2016.

McIntosh claims that the statutory language of MCL 500.3145 clearly states that the "one-year-back rule" refers to "one year back" from "the date on which the action was commenced."

Because the collision occurred on January 2, 2016, and McIntosh filed his action (17-95-NF) on January 3, 2017 (because January 2, 2017 was a holiday and the courts were closed), he maintains that the claim was timely filed within one year of the January 2, 2016 collision. However, under *Shah v State Farm Mut Auto Ins Co,* 324 Mich App 182; 920 NW2d 148 (2018), a complaint for no-fault benefits that is amended based on an assignment theory is limited to the benefits incurred one year before the date of the assignment, not the date of the original complaint. Although MCR 2.118(D) provides that an amendment that adds a claim or defense generally relates back to the date of the original pleading, this rule, according to *Shah*, does not apply to make the amended complaint based on the assignment of rights date back to the original complaint. "[T]he procurement of the assignments was an event that occurred after the filing of the original complaint and provided the only means by which [the provider plaintiffs] could have standing to maintain a direct action against [defendant] for recovery of no-fault benefits in this case," such that "plaintiffs motion [for leave to amend] actually sought leave to file a supplemental pleading." *Id*. at 204, citing *Covenant Medical Center, Inc v State Farm Mut Auto Co,* 500 Mich 191; 895 NW2d 490 (2017), and MCR 2.118(E). According to *Shah*, there is no provision for relating back with respect to supplemental pleadings. *Id*. at 203, 205; MCR 2.118(E). Because Genie Therapy amended its original complaint to assert standing based on the assignment of rights it received on August 15, 2017, any benefits incurred prior August 15, 2016, are therefore barred by the one-year-back rule under *Shah*, 324 Mich App at 204-205.

In any event, McIntosh cannot pursue an appeal for claims which he assigned to Genie Therapy because he is no longer the real party in interest as to those claims. See *Cannon Twp v Rockford Pub Sch*, 311 Mich App 403, 412; 875 NW2d 242 (2015) (an assignee of a cause of action becomes the real party in interest, inasmuch as the assignment vests in the assignee all rights previously held by the assignor). Genie Therapy has never appealed the order dismissing its claims, and McIntosh, having assigned those claims to Genie Therapy, cannot now pursue them on appeal.

Affirmed.


/s/ Kirsten Frank Kelly
/s/ Deborah A. Servitto