*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

KIMBERLY KAMINSKY,

        Plaintiff-Appellee,

v

MATTHEW RONTAL, M.D., and WILLIAM
BEAUMONT HOSPITAL, INC.,

        Defendants-Appellants,

and

OAKLAND MEDICAL SERVICES, doing
business as THE RONTAL CLINIC,

        Defendant.

UNPUBLISHED
April 2, 2020

No.   345678
Oakland Circuit Court
LC No.   2017-157761-NH

---

KIMBERLY KAMINSKY,

        Plaintiff-Appellee,

v

MATTHEW RONTAL, M.D., and OAKLAND
MEDICAL SERVICES, doing business as THE
RONTAL CLINIC,

        Defendants-Appellants,

and

WILLIAM BEAUMONT HOSPITAL, INC.,

        Defendant.

No.   345706
Oakland Circuit Court
LC No.   2017-157761-NH

-1-

Before: K. F. KELLY, P.J., and BORRELLO and SERVITTO, JJ.

K. F. KELLY, P.J. (*concurring in part and dissenting in part*).

I concur with the majority with respect to its analysis regarding MCLA 600.2955.[1]  With respect to the causation issue, I respectfully dissent.   Plaintiff's expert failed to establish a question of fact concerning factual causation. Plaintiff's expert merely offered speculation and guesswork on the causation element of a medical malpractice claim.  It is beyond question that "testimony that only establishes a correlation between conduct and injury is not sufficient to establish cause in fact." *Teal v Prasad*, 283 Mich App 384, 392; 772 NW2d 57 (2009).  "It is axiomatic in logic and in science that correlation is not causation.  This adage counsels that it is error to infer that A causes B from the mere fact that A and B occur together." *Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67 at 93.  "Our case law requires more than a mere possibly or a plausible explanation."  *Id.* at 87.  In short, without more, the mere fact that plaintiff suffered malocclusion after a horrific accident and surgery is not sufficient to establish defendants' actions as a cause in fact of the malocclusion that she subsequently experienced.  I would reverse and remand for entry of an order granting defendants' motion for summary disposition.

I.  BASIC FACTS

The majority sets forth the pertinent facts.  On September 7, 2014, plaintiff went to the hospital and initially reported that she fell on a deck.  She later disclosed to a nurse that she fell off the back of a motorcycle driven by her boyfriend, Robert Gabbard.[2]  Plaintiff fractured her mandible near the right condyle, more commonly known as a broken jaw, and chipped several teeth.  Dr. Rontal performed an endoscopic open reduction internal fixation of the fracture, assisted by Christopher Firlit, D.D.S.  Dr. Firlit held plaintiff in occlusion while plating was performed.  Additionally, plaintiff opined that she was in occlusion.  The next morning, Dr. Firlit examined plaintiff and noted that her occlusion appeared stable.

A.  DR. WILLIAM CLARK'S DEPOSITION

Plaintiff retained Dr. William Clark, a pediatric otolaryngologist[3] with 43 years of experience, to provide expert testimony.  He had never performed the endoscopic open reduction procedure used by Dr. Rontal to treat plaintiff, and his colleagues also did not perform the procedure.  Nonetheless, Dr. Clark criticized the performance of the procedure and opined that, contrary to the medical records, plaintiff was not in occlusion at the operation's conclusion.  In 2014, Dr. Clark performed surgery two days a week,

---

[1] I do agree with defendants that Dr. Clark's deposition would appear to provide little support for the admissibility of his testimony under the statute; but the argument was never fully made, the trial court did not address it, and more importantly, plaintiff was not offered an opportunity to respond in a meaningful way.

[2] Plaintiff's expert, Dr. William Clark, noted that a fall from a motorcycle would seemingly result in an injury to the back of the head, not the front.

[3] Dr. Clark focused on pediatrics since June 2006, when he moved from Florida to Texas.  However, he would occasionally treat adult trauma at the hospital, and his practice treated patients until the age of 21 or if the patient had special needs.

but he did not use the endoscope to repair mandibular or subcondylar fractures and was not trained on the procedure. Dr. Clark last performed a surgical repair of a subcondylar fracture on an adult in 2005. He agreed that plaintiff's surgery was necessary and did not criticize the technique or the approach used by Dr. Rontal. In fact, Dr. Clark testified that plaintiff's post-operation condition was not necessarily a malpractice result:

> *Q.* Can we agree that malocclusion following surgical repair is not in and of itself negligence?
>
> *A.* It's a complication. It might or might not be a result of negligence.
>
> *Q.* But it's something that can happen even when a surgery is reasonably well-performed?
>
> *A.* Yes, ma'am.
>
> \* \* \*
>
> *Q.* Okay. So I just want to make sure that I understand what you're saying. There is a certain degree of malocclusion that, if it occurs following open reduction and internal fixation, would not be indicative of an inappropriately performed surgery?
>
> *A.* Correct.
>
> *Q.* Okay. but you're saying that if - - the occlusion is "way off," to use your terms \* \* \* then that must mean somebody did something wrong?
>
> *A.* Something - - something happened. And the only two things I can think of that could happened would be that the - - something inappropriate happened. That would - - the only two theories I could come up with are that the teeth were not in good occlusion when the fixation was applied or something disastrously happened postoperatively such as a new injury that broke - - or a failure of the hardware where the screws came loose, the plate moved or there was trauma to the region, something of that nature. Those are the only two ways I can see an occlusion being, as I maybe inappropriately said, quote, way off, unquote.
>
> But gross malocclusion might be a better term to use. Gross malocclusion, in my mind, can only happen if the plates are put on with the patient not in good occlusion or if some failure of the hardware occurs or trauma - - regional trauma occurs.

Although the medical records indicated that plaintiff was in good occlusion immediately after the surgery, and an examination of plaintiff by Dr. Firlit the next day documented her condition as in stable occlusion, Dr. Clark opined that plaintiff was not. When questioned regarding whether Dr. Clark was protesting the power of observation by Dr. Rontal and his assistant Dr. Firlit, Dr. Clark stated that their opinion was wrong as evidenced by the patient outcome. When questioned regarding postoperative reports or scans, Dr. Clark did not recall examining them for good reduction of the bone segments.

Further, he acknowledged that radiographically, there was no evidence of improper performance of the surgery or the technique. Although he attributed the hardware function of loosening the screws as a possible cause of malocclusion, Dr. Clark did not allow bone absorption to have an impact on hardware because it would not occur fast enough, according to his experience.

When questioned about Dr. Rontal's note that plaintiff was in occlusion, Dr. Clark did not dispute that plaintiff was in occlusion at the time, but asserted just not "well enough." The following exchange occurred:

> *Q.* Do you think that Dr. Rontal was mistaken when he determined based on his inter-operative observations, that the patient was in occlusion when he was plating?
>
> *A.* It would be hard for him to see. He's depending on his assistant.
>
> *Q.* Okay. Can you answer my question, though? You think he was mistaken when he made the determination that the patient was in occlusion while he was plating?
>
> *A.* Yes.
>
> *Q. And the only reason you think that is because of the outcome that occurred in this case?*
>
> *A. That and the fact that it's very, very difficult to hold the patient in good occlusion with your hands while somebody is putting a plate on.* (Emphasis added.)

Yet, Dr. Clark concluded that having someone hold a patient in occlusion while plating did not violate the standard of care. He again acknowledged that complications could arise from the surgery even if perfectly performed:

> *Q.* Even if properly treated, patients who have trauma to the jaw can experience those problems, can they not?
>
> *A.* There can be complications with - - there can be a poor - - a less than perfect outcome from - - from any - - any treatment of any condition, yes.
>
> *Q.* Even reasonably - - even reasonably performed treatment can have a less than desirable outcome?
>
> *A.* Yes, ma'am.

Dr. Clark acknowledged that, in providing informed consent, the patient is advised that even if performed correctly, a malocclusion is still possible. Further, he agreed that degenerative joint disease may worsen over time, it impacts how the jaw fits together, and it may be the most likely explanation for the bite worsening over time. Dr. Clark noted that there are factors that impact the occlusion including swelling. Additionally, postoperative conduct, such as the patient failing to wear the repositioning split and engage in follow up care, may have an impact.

Next, Dr. Clark commented on how the procedure was performed and the visualization of it, despite the fact that he had never performed it. Specifically, Dr. Clark opined that an endoscope could not be used to determine whether a patient was in occlusion because it would only observe a small area. When questioned about movement of the scope to obtain a broader view, he opined that things could shift when viewing a new area through the scope. However, Dr. Clark then conceded that he had no experience with an endoscope. He also accepted that Dr. Rontal would visually inspect plaintiff to determine if she was in occlusion or rely on Dr. Firlit. Yet, Dr. Clark opined that between the time of an observed occlusion and moving to the endoscope, there could be movement because Dr. Rontal "can't see both fields at the same time." However, counsel then questioned whether the very purpose of the surgery and its conclusion ensure occlusion:

> *Q.* But when you're finished with a procedure, what you would do is you would look to see whether or not the patient is in occlusion. Correct?
>
> *A.* Hopefully, yes, sir.
>
> *Q.* Yeah. All right. And you have no reason to believe that Dr. Rontal didn't do that in this case. Correct?
>
> *A.* Correct.
>
> *Q.* I mean the point of doing the procedure is to make sure that the patient is in occlusion after you've done the procedure. Correct?
>
> *A.* Yes, sir.
>
> *Q.* All right. So based upon everything you know about otolaryngology and how this procedure is done and Dr. Rontal, you would conclude that that effort certainly was made after the patient was fixed. Correct?
>
> *A.* I would hope so, yes, sir.

Dr. Clark admitted after a patient is appropriately fixed, he or she can lose occlusion. He also initially denied that the endoscopic surgical procedural had a greater likelihood of normal occlusion, but admitted that he did not have the necessary experience to answer the question.

## II. STANDARD OF REVIEW

A trial court's ruling on a motion for summary disposition is de novo. *Bennett v Russell*, 322 Mich App 638, 642; 913 NW2d 364 (2018). Summary disposition is appropriate pursuant to MCR 2.116(C)(10) where there is "no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). When reviewing a motion for summary disposition challenged under MCR 2.116(C)(10), the court considers the affidavits, pleadings, depositions, admissions, and other admissible documentary evidence then filed in the action or submitted by the parties. MCR 2.116(G)(4), (G)(5); *Puetz v Spectrum Health Hosps*, 324 Mich App 51, 68; 919 NW2d 439 (2018). In responding to a motion for summary disposition, a party bearing the burden of proving causation must "set forth specific facts that would support a reasonable inference of a logical sequence of cause and effect." *Skinner v Square D Co*, 445 Mich 153, 174; 516 NW2d 475 (1994). Causation may be shown

circumstantially, but "[t]o be adequate, a [party's] circumstantial proof must facilitate reasonable inferences of causation, not mere speculation." *Id*. at 164. "[T]he evidence need not negate all other possible causes," but "this Court has consistently required that the evidence exclude other reasonable hypotheses with a fair amount of certainty." *Craig,* 471 Mich at 87-88; (internal citation and quotation marks omitted). "Our case law requires more than a mere possibility or a plausible explanation." *Id*. at 87. In other words, "litigants do not have any right to submit an evidentiary record to the jury that would allow the jury to do nothing more than guess." *Skinner*, 445 Mich at 174.

## III. ANALYSIS

Defendants asserts that they were entitled to summary disposition because Dr. Clark's expert testimony addressing Dr. Rontal's purported breach of the standard of care was inadmissible as mere speculation. I agree.

As noted by the majority, four factors must be established for a plaintiff to prove a medical malpractice claim:

> (1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. [*Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016) (Citation and quotation omitted).]

"Expert testimony is required to establish the standard of care and to demonstrate the defendant's alleged failure to conform to that standard." *Decker v Rochowiak*, 287 Mich App 666, 685; 791 NW2d 507 (2010). A qualified expert witness may testify in the form of an opinion if "(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." MRE 702. It is insufficient for expert testimony to merely establish a correlation between conduct and an injury for purposes of establishing causation in a medical malpractice action. *Teal*, 283 Mich App at 392. "[A] plaintiff cannot establish causation if the connection made between the defendant's negligent conduct is speculative or merely possible." *Id*.

Defendants are correct that "an expert's opinion is objectionable where it is based on assumptions that are not in accord with the established facts." *Badalamenti v William Beaumont Hospital-Troy*, 237 Mich App 278, 286; 602 NW2d 854 (1999), lv den 463 Mich 980 (2001). This rule applies where an expert witness's testimony is not consistent with that of a witness who personally observed an event and where the expert cannot reconcile his inconsistent testimony without disparaging the witness's power of observation. *Id*.

In *Badalamenti*, the plaintiff claimed that the defendant doctor negligently failed to diagnose and properly treat the plaintiff for cardiogenic shock. *Id*. at 281. The plaintiff's claim was dependent on proof that he in fact suffered from cardiogenic shock. *Id*. at 285. The plaintiff's sole expert witness testified as to the three objective hemodynamic measurements required for a diagnosis of cardiogenic shock. *Id*. at 286. Though the evidence of those hemodynamic measurements did not support a finding of cardiogenic shock because certain measurements were within normal range, the expert witness testified that his opinion that the plaintiff was in cardiogenic shock was based on his skepticism of the results of the echocardiogram and the determination of the physician who performed the echocardiogram that the wall function of the plaintiff's heart was nearly normal. *Id*. at 286-287.

This Court noted that the physician who performed the echocardiogram observed and studied the echocardiogram while it was being conducted. *Id*. at 288. The reports of other doctors who performed echocardiograms on the plaintiff in the days after the first confirmed the first physician's findings. *Id*. The expert agreed that the last of the echocardiograms did not show major damage to the plaintiff's heart wall and that certain functions were within normal range. *Id*. He acknowledged that if, contrary to his skepticism, the first echocardiogram showed relatively normal function, he could agree that there was no cardiogenic shock and "that if the basis of his opinion were wrong, his opinions were flawed and incorrect." *Id*.

This Court explained:

> [T]he record clearly reflects that [the expert] had no reasonable basis in evidence to support his position that plaintiff's left ventricular heart wall function was significantly damaged on March 16, which he agreed was the pertinent time frame and the definitive component for cardiogenic shock. Rather, as he explained, he based his opinion on his skepticism and disparagement of [the doctor's] findings. This testimony was legally insufficient to support [the] expert opinion, through which plaintiff's liability theory was presented, that plaintiff was in cardiogenic shock on March 16. [*Id*. at 288-289.]

After a review of Dr. Clark's testimony, I would conclude that he failed to present expert admissible testimony to establish a breach of the standard of care or proximate causation. He testified that a visual determination/inspection was the proper method to asses a patient's condition. He did not have a different interpretation of the process of the operation; rather he disagreed that the two surgeons actually saw what they saw (and contemporaneously documented in the medical records); in other words, to support Dr. Clark's opinion, the two surgeons present at the procedure must have just seen things that just weren't there.[4]

Moreover, Dr. Clark had never performed this procedure. Although he acknowledged that a negative outcome could occur from the correct performance of this surgery, he testified that, in this instance, he examined the negative outcome and looked for a theory to support a negligent act that caused the outcome. However, his theory that the endoscopic procedure resulted in malocclusion is premised on his view that the observation of the occlusion is insufficient through the endoscope, and there was the possibility of movement out of occlusion after the view through the endoscope. However, Dr. Clark had to surmise about the extent of the view through the endoscope and the possibility of movement because he had never performed the procedure. Furthermore, Dr. Rontal did not perform this surgery in isolation, but rather, Dr. Firlit aided in the procedure; he also concluded that plaintiff was in occlusion and held her in occlusion. Dr. Clark failed to explain how this procedure, when performed in tandem, would result in plaintiff's movement out of occlusion into malocclusion.

---

[4] Thus, I believe that *Badalamenti* rather than *Taylor Estate v Physician Group*, ____ Mich App ____, ____; ____NW2d ____ (2019) (Docket No. 338801; slip op at 7; lv pending), controls the outcome of this case. *Taylor* is further distinguishable because none of plaintiff's treating physicians at the time of surgery provided either a conflicting subjective or objective opinion that would support Dr. Clark's conclusion regarding Dr. Rontal's alleged breach of the standard of care.

Although Dr. Clark opined that Dr. Rontal may have been mistaken regarding placement in occlusion, he acknowledged that this procedure may nonetheless result in malocclusion. More importantly, he testified that he examined the negative outcome and then worked backward to come up with possible theories of medical malpractice. Additionally, Dr. Clark's opinion was contradictory. He opined that Dr. Rontal's conclusion that plaintiff was in occlusion was incorrect as evidenced by the *outcome*. However, he later testified that he did not dispute Dr. Ronal's conclusion that plaintiff was in occlusion, but posited that the occlusion was not "well enough." Additionally, when pressed with whether swelling, cause of injury, and trauma could play a role in plaintiff's outcome, he acknowledged those negative factors, but nonetheless continued to opine that it played no role in this case.

Dr. Clark's testimony regarding his lack of performing or familiarity with the procedure at issue, his reliance on plaintiff's negative outcome and his search for a theory to support it, and his contradictions regarding whether Dr. Rontal and Dr. Firlit ensured whether plaintiff was in occlusion or in occlusion "enough", does not equate with a dispute regarding the power of observation, but rather presents a speculative opinion without a foundation. In essence, plaintiff presents a "res ipsa loquitur" to support the theory of causation, see *Clover Leaf Co v Phillis Petroleum Co*, 231 Mich App 186, 193-194; 540 NW2d 297 (1995). ("The major purpose of the doctrine of res ipsa loquitur is to create at least an inference of negligence where plaintiff is unable to prove the occurrence of a negligent act.") This is insufficient to create a question of fact in this case.

In summary, I conclude that plaintiff failed to present admissible evidence of the breach of the standard of care through Dr. Clark. Although an otolaryngologist, Dr. Clark did not perform the endoscopic procedure that was performed on plaintiff by Dr. Rontal. He admitted that he focused on plaintiff's subsequent evidence of malocclusion and chose to correlate it to the initial procedure. While he asserted that the endoscopic view of the procedure was not wide enough to determine occlusion, he was without a factual basis to render it because he had never performed the procedure with that method. Under the circumstances, the trial court erred in denying defendants' motion for summary disposition by concluding that a question of fact was created.

I would reverse and remand for entry of an order granting defendants' motions for summary disposition.

/s/ Kirsten Frank Kelly

-8-